08 CIV 7281

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JINO KURIAKOSE, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>v.<br><br>FEDERAL HOME LOAN MORTGAGE COMPANY, RICHARD SYRON, PATRICIA L. COOK and ANTHONY S. PISZEL<br><br>                    Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED** |



## INTRODUCTION

Plaintiff by its undersigned attorneys, alleges upon personal knowledge as to it and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements, Information Statements and Supplements issued by the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Company"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and information readily obtainable on the internet.

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of purchasers of Freddie Mac's securities from November 21, 2007 through and including August 5, 2008 ("Class Period") for violations of the Securities Exchange Act of 1934 ("Exchange Act").

2.     Freddie Mac is a federally-chartered, shareholder owned corporation created by Congress in 1970 to help provide liquidity, stability and affordability to the U.S. housing market. As a government-sponsored enterprise ("GSE") responsible for maintaining a stable housing market, Freddie Mac enjoyed a special position of public trust.

3.     Throughout the Class Period, Defendants violated that trust by concealing and misrepresenting to investors the Company's massive exposure to mortgage-related losses, poor underwriting standards and risk management procedures and the resulting negative impact to its capital adequacy. Freddie Mac took on massive exposure to subprime and other nontraditional, risky loans, in particular "Alt-A" loans, which are given to borrowers with better-than-subprime credit scores but without full documentation. At the same time, the Company failed to maintain an adequate capital cushion, which is a crucial safety net to protect against a downturn in housing prices.

4.     Defendants received internal warnings as early as 2004 that Freddie Mac's shoddy underwriting standards, virtually non-existent risk management procedures and resulting purchase of low-quality, risky mortgages and mortgage-backed securities had left it exposed to massive losses. Similarly, Defendants knew, or recklessly disregarded, that Freddie Mac's capital base was insufficient. Yet, Defendants falsely reassured investors as to the soundness of Freddie Mac's mortgage portfolio, its underwriting and risk management and the sufficiency of its capital.

2

5.     When the housing market crumbled in 2007, Freddie Mac's huge exposure to subprime and Alt-A mortgages and thin capitalization left it in an increasingly perilous financial position. As housing prices plummeted and borrowers defaulted in droves, Defendants herein continued to mislead investors as to Freddie Mac's exposure to mortgage-related losses and the negative effects on its capital. The impact of Freddie Mac's massive losses on its mortgage holdings and failure to maintain an adequate capital base has been dire: the Company is now in such feeble condition that the federal government has prepared a taxpayer-financed bailout that is estimated to cost taxpayers tens of billions of dollars. In fact, by the second quarter of 2008, the fair value of Freddie Mac's assets was actually negative $5.6 billion.

6.     Starting as early as 2004, Freddie Mac executives received internal warnings that the Company was taking on excessive risk by purchasing subprime and Alt-A loans. As reported in an August 5, 2008 New York Times article entitled At Freddie Mac, Chief Discarded Warning Signs, Freddie Mac Chief Executive Officer ("CEO") Richard F. Syron ("Syron") received a memorandum from the Company's former Chief Enterprise Risk Officer, David A. Andrukonis ("Andrukonis") in mid-2004 advising him "that [Freddie Mac's] underwriting standards were becoming shoddier and the company was becoming exposed to losses." Andrukonis also briefed the risk oversight committee of the Company's Board of Directors on his memorandum, but the committee failed to act. The New York Times quotes Andrukonis as saying that the loans "would likely pose an enormous financial and reputational risk to the company and the country."

7.     Syron also received warnings from Freddie Mac's former head of compliance and oversight, Donald Solberg ("Solberg"), who advised Syron that the Company's capital base needed to be replenished. Solberg was not the only person to advise Syron that Freddie Mac lacked adequate capital; as reported by the New York Times, in 2007 U.S. Treasury Secretary Henry M. Paulson, Jr. ("Paulson") and Federal Reserve Chairman Ben S. Bernanke ("Bernanke") also urged Freddie Mac, and its sibling GSE, the Federal National Mortgage Association ("Fannie Mae"), to raise more money and bolster their balance sheets– with Bernanke threatening to publicly chastise the companies if they did not raise more cash. Finally, as home prices plummeted and defaults shot up in 2007, advisors at Freddie Mac exhorted Defendant Syron to slow the Company's mortgage purchases.

8.     However, rather than heeding these warnings, Defendants misled investors as to the Company's true capital and risk situation, while actually increasing the Company's risk exposure and degrading its capital position. In 2007 alone, Freddie Mac expanded its retained portfolio by approximately $17 billion, which increased its mortgage holdings by 2.4%. At the same time, the Company's underwriting standards and risk management procedures became shoddier, so that an increasing number of the loans Freddie Mac added to its portfolio were low quality, high credit risk mortgages. Freddie Mac's capital base also grew weaker as the Company's mortgage-related losses ballooned.

9.     Although Defendants knew, or recklessly disregarded, that Freddie Mac's mortgage portfolio was becoming increasingly risky and that its capital position was becoming progressively weaker, they continued to mislead investors throughout the Class

4

Period as to Freddie Mac's exposure to highly risky and non-performing mortgages and the threat to its capital adequacy. Instead, Defendants offered false reassurances as the Company's safety and soundness.

10.     On November 20, 2007, Freddie Mac began the first of four consecutive quarters of losses which represented only the beginning of Freddie Mac's ensuing financial crisis. Yet, after the Company's November 20, 2007 announcement of a third quarter loss of $2 billion due to its deteriorating mortgage portfolio, Freddie Mac's Chief Financial Officer ("CFO") Anthony S. Piszel ("Piszel") falsely reassured investors that "[d]uring the past year we have taken important steps to address the impact of the declining housing and credit markets to our business … we have begun raising prices, *tightened our credit standards and enhanced our risk management practices.*" (emphasis added). Although the news caused the Company's stock price to drop by over $10 per share, or 29%, from $37.50 at close on November 19, 2007 to $26.74 at close on November 20, 2007, Freddie Mac continued to conceal the true extent of its problems.

11.     Defendant Piszel further misled investors during the Company's November 20, 2007 earnings call, stating that Freddie Mac was expecting $10 to $12 billion in credit losses over 2008 and 2009. The actual costs have been far higher: the Company has added $12.5 billion to date to its reserve for loan losses, and on August 5, 2008, produced tables showing the lifetime default cost on its mortgage portfolio could range from $16 billion to $42 billion. The sharp contrast between Piszel's public commentary and the internal warnings provided to Defendants, beginning as far back as 2004, highlights the extent to which Freddie Mac concealed and misrepresented its problems to investors.

5

12.     Defendant Piszel also misrepresented the Company's capital adequacy to investors. In a statement made in the Company's February 28, 2008 Supplement to its Information Statement ("February 28, 2008 Supplement"), he reassured the investing public that "*[i]n 2008, we will continue to prudently manage our capital, particularly given the outlook for continued weakening in the housing market*." (emphasis added). Similarly, Freddie Mac's May 14, 2008 Financial Report for the Three Months Ended March 31, 2008 misled investors by stating that the Company managed its risk through its "underwriting and quality control processes. *Our underwriting process evaluates mortgage loans using several critical risk characteristics, such as credit score, LTV ratio and occupancy type … if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage or make us whole in the event of a default.*" (emphasis added). In fact, as Defendants failed to disclose, the Company's underwriting and risk management were shoddy and did virtually nothing to help manage Freddie Mac's risk.

13.     Investors gained a greater understanding of Freddie Mac's true financial risk on April 15, 2008, when Freddie Mac's federal regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO") issued its annual report to Congress. In its report, OFHEO referred to Freddie Mac executives' "strategic decision to purchase and guarantee certain single-family mortgages originated in 2006 and 2007 with higher-risk characteristics." OFHEO also reported that Freddie Mac had fallen below the capital level required to maintain "safety and soundness," and was in danger of being ordered by OFHEO to "cease and desist" buying mortgages until it replenished its capital base.

6

14.     On June 25, 2008, additional indications of Freddie Mac's perilous

financial condition emerged when the Company announced that it had increased its

retained mortgage portfolio by 53.4%. Bloomberg News then reported after the market

close that "the cost of protecting the debt of Freddie Mac" from default had risen to its

highest rate in more than three months. On news that the Company had increased its

portfolio size while the cost of default protection rose, share prices fell $1.48 per share or

7.40% from $20.01 at close on June 25, 2008 to close at $18.53 per share on June 26,

2008. Fears of increased losses at Freddie Mac were reinforced on June 30, 2008, when

the Associated Press reported that defaults on loans backed by Freddie Mac and its fellow

GSE, Fannie Mae, rose 48% compared to a year earlier. The Company's share price

dropped $1.45 per share or 8.12% on this news, from $17.85 per share at close on June

27, 2008 to $16.40 per share on June 30, 2008; however, Defendants continued to

conceal and misrepresent the Company's financial risk.

15.     On August 6, 2008, investors learned more about the extent of Freddie

Mac's financial crisis when the Company announced its fourth straight quarterly loss.

The Company disclosed a second quarter loss of $821 million, wrote down $1 billion in

subprime and other risky mortgages held in its portfolio, and, ominously, increased its

reserves for losses in its mortgage portfolio by $2.8 billion. Worse, the August 6, 2008

earnings release exposed Freddie Mac as being effectively insolvent. Market

commentators and analysts noted that after subtracting Freddie Mac's liabilities from the

total worth of the assets on its balance sheet, the Company actually had a negative value.

As reported by the Wall Street Journal in an article entitled Freddie Needs Equity Lift, the

Company "is now in the unenviable position of having negative equity attributable to

7

common shareholders of $1.2 billion ... So shareholders would wind up with nothing if Freddie sold its assets and paid down its debt." The sharp drop in the Company's share price that accompanied the August 6, 2008 disclosure also limited Freddie Mac's ability to raise the cash it needed to shore up its balance sheet. As Peter Morici, a professor at the University of Maryland business school commented, "It's difficult for them to raise money now because they have to sell share prices at a very low value." In fact, an August 7, 2008 Wall Street Journal article noted that Freddie Mac's decision to delay a planned $5.5 billion stock sale in light of the Company's depressed stock price could "dig[] existing shareholders into a deeper hole because the firm could ultimately be forced to raise capital at even worse prices."

16.     Freddie Mac's stock price plunged on this news on heavy volume from $8.04 per share at close on August 5, 2008 to $6.49 per share at close on August 6, 2008, a loss of $1.55 per share, or 19%. Freddie Mac's stock fell further on August 7, 2008, to close at $5.89 per share, a drop of almost 9%.

17.     As a result of Defendants' wrongful acts and omissions, Plaintiff and other members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Section 10(b), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Many of the acts and practices complained of herein occurred in substantial part in this District and the Company's securities trade on the New York Stock Exchange, which is located in the District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

22.     Plaintiff, purchased Freddie Mac common stock at artificially inflated prices during the Class Period, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby.

23.     Defendant Freddie Mac is a federally–chartered corporation with its principal place of business at 8200 Jones Branch Drive, McLean, Virginia.  Congress established Freddie Mac in 1970 to support rental housing and home ownership.  Freddie Mac is owned by its shareholders, and its common stock is listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "FRE."

24.     Defendant Syron was, at all relevant times, Chairman of the Board and CEO of Freddie Mac.  Syron, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements.  Syron publicly commented on Freddie Mac's financial performance in its quarterly and annual earnings press releases, in investor conference calls held during the Class Period, and during interviews with the media.  Syron signed certifications

9

attesting to the accuracy of the Company's November 20, 2007 Information Statement Supplement, the Company's February 28, 2008 Information Statement and the Company's May 14, 2008 Information Statement Supplement.

25.     Defendant Patricia L. Cook ("Cook") joined Freddie Mac on August 2, 2004 as Executive Vice President for Investments. She was named Chief Business Officer in June 2007. Cook, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Cook publicly commented on Freddie Mac's financial performance in press releases, conference calls, articles and other public presentations and speeches held during the Class Period.

26.     Anthony "Buddy" Piszel joined Freddie Mac in November 2006 as an Executive Vice President and CFO. As CFO, Piszel was responsible for the Company's financial controls and financial reporting. He, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Piszel signed certifications attesting to the accuracy of the Company's November 20, 2007 Information Statement Supplement, the Company's February 28, 2008 Information Statement and the Company's May 14, 2008 Information Statement Supplement.

27.     Defendants Syron, Cook and Piszel are collectively referred to herein as the "Individual Defendants." Collectively with Freddie Mac, the Individual Defendants are referred to herein as "Defendants."

28.     As officers of a publicly-held company traded on the NYSE, the Individual Defendants possessed the power and authority to control the content of

Freddie Mac's public Information Statements and Supplements and statements or reports made in press releases, conference calls, news articles and/or other public forums. Each Individual Defendant had a duty to disseminate accurate and truthful information with respect to the Company's financial condition, liabilities, interests, earnings and present and future business prospects, and to correct any previously issued statements that were erroneous.

29.     The Individual Defendants, because of their positions as officers and/or directors of the Company, were able to, and did, control the content of the various Information Statements and Supplements, press releases and other public statements pertaining to the Company during the Class Period. Because of their positions at Freddie Mac and their access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were thus materially false and misleading.

30.     As a result of the foregoing, each of the Individual Defendants was and is responsible for the accuracy of the public Information Statements and Supplements, press releases and other Company statements as detailed herein, which were the result of the collective actions of the Individual Defendants, and are personally liable for the misrepresentations and omissions contained herein.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

31.     Congress established Freddie Mac in 1970, at a time when the U.S. economy was strained by the Vietnam War, with the purpose of stabilizing the nation's

11

mortgage markets and expanding opportunities for home ownership and affordable rental housing. The Company fulfills this mission in part by purchasing residential mortgages and mortgage-backed securities in the secondary mortgage market, and is one of the largest purchasers of mortgages in the U.S. Backed by the implicit guarantee of the government, Freddie Mac has been able to borrow money at lower rates than banks and profit by purchasing higher-yielding mortgages from home lenders, providing capital for loans. As a GSE, Freddie Mac is also subject to mandatory capital requirements and must maintain a capital surplus as required by OFHEO.

32.     Freddie Mac's business has two major components. The Company purchases mortgage loans and mortgage-backed securities and holds them as assets on its balance sheet, funding those purchases by issuing short and long-term debt. Freddie Mac also has a substantial mortgage securitization business, in which it issues securities to investors backed by pools of mortgage loans. The principal and interest payments on the underlying loans flow to the investors, while, for a fee, Freddie Mac assumes the credit risk – meaning the risk that the borrower will default – on the loans.

33.     During the Class Period, Defendants misled investors as to the soundness of the Company's mortgage portfolio, its underwriting standards and the adequacy of its capital. Meanwhile, the Company took on massive exposure to subprime and other non-traditional, risky loans, including Alt-A loans, while allowing the Company's capital base to shrink. Defendants' purchase of such risky, non-performing mortgages and mortgage-related instruments was never disclosed to investors. In fact, Defendants misled investors as to the soundness of Freddie Mac's mortgage portfolio, its underwriting and risk

12

management standards and the adequacy of its capital and falsely reassured them of the
Company's safety and soundness.

## B. Defendants' False and Misleading Statements

34.     On November 20, 2007, the Company announced a third quarter loss of \$2
billion due to higher-than-expected delinquencies in loans held in its mortgage portfolio.
However, despite this announcement, Defendants were concealing the true extent of the
Company's financial problems.

35.     As part of its November 20, 2007 announcment, the Company issued a
Supplement to its March 23, 2007 Information Statement ("November 20, 2007
Supplement"). In the November 20, 2007 Supplement, the Company attempted to
downplay the significance of its losses, noting, among other things:

"During the past year we have taken important steps to address the impact of the
declining housing and credit markets to our business," Piszel added. "*We have
begun raising prices, tightened our credit standards and enhanced our risk
management practices*. We also continue to improve our internal controls as we
move closer to completing our remediation efforts and returning to timely
financial reporting. These actions position us well to take advantage of
opportunities when the current market dislocation ends."

\*\*\*

### *Capital Management*

Estimated regulatory core capital was \$34.6 billion at September 30, 2007, *which
represented an estimated \$8.5 billion in excess of the regulatory minimum
capital requirement, and an estimated \$0.6 billion in excess of the 30 percent
mandatory target capital surplus directed by OFHEO*. Retained portfolio sales in
September and October largely reflected activities to manage to the 30 percent
mandatory target capital surplus.

(*emphasis added*)

36.     Also on November 20, 2007, the Company issued its "Financial Report for
the Three and Nine Months Ended September 30, 2007 in the form of a Supplement to its

March 23, 2007 Information Statement ("November 20, 2008 Financial Report"). The

November 20, 2008 Financial Report stated in relevant part:

### Capital Management

*Our primary objective in managing capital is preserving our safety and soundness. We also seek to have sufficient capital to support our business and mission. As appropriate, we make investment decisions based on our capital levels. In September 2007, we reduced the balance of our retained portfolio in order to manage to the 30% mandatory target capital surplus.* At September 30, 2007, our estimated regulatory core capital was $34.6 billion, which is an estimated $8.5 billion in excess of our regulatory minimum capital requirement and $0.6 billion in excess of the 30% mandatory target capital surplus.

\*\*\*

### Mortgage Credit Risk

Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and the general economic environment. *To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements.*

All mortgages that we purchase for our retained portfolio or that we guarantee have an inherent risk of default. *We seek to manage the underlying risk by adequately pricing for the risk we assume using our underwriting and quality control processes. Our underwriting process evaluates mortgage loans using several critical risk characteristics, such as credit score, loan-to-value ratio and occupancy type.*

\*\*\*

Certain loan characteristics are often associated with a higher degree of credit risk. For example, mortgages with high LTV ratios and borrowers who have lower credit scores typically experience higher rates of delinquency, default andcredit losses. *We take a disciplined approach to the acquisition of mortgage loans and generally participate in these products when we believe we are appropriately compensated for the credit risk.*

(*emphasis added*)

14

37.     As part of the Company's November 20, 2008 Financial Report,

Defendants Syron and Piszel each signed a certification stating:

1. I have reviewed this Information Statement Supplement of Freddie Mac;

2. Based on my knowledge, this Information Statement Supplement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Information Statement Supplement; and

3. Based on my knowledge, the unaudited consolidated financial statements, and other financial information included in this Information Statement Supplement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement Supplement.

38.     Also on November 20, 2007, the Company held its Q3 2007 Earnings

Conference Call ("Q3 2007 Conference Call"). On the call, the Company's management

team continued their campaign to portray the Company as above the market turmoil and

well positioned. For example, Defendant Syron stated, "*I want to reiterate to everyone

on the call that the GSEs were set up for times like these. Over time, Freddie has

prospered by committing capital in these environments, managing credit and interest

rate risk to acceptable levels and earning attractive long-term results.*" Following

Defendant Syron's comments, Defendant Cook explained to investors that the

Company's assets were of the "highest credit quality:

Let's turn to a discussion of the risk profile and profit outlook for the retained portfolio. *The credit profile of our retained portfolio remains of the highest credit* quality with 57% in agency mortgages and 33% in non-agency securities, of which 97% is AAA rated and does not include any CDOs. These asset-backs are critical to our ability to meet our affordable lending objectives and allowed us to invest in non-prime markets with substantial credit enhancements. *Despite the continued deterioration of the housing market and increases in non-prime delinquencies, we remain comfortable with our risk position on these assets.* For the subprime securities, while we have experienced some downgrades, we have high levels of subordination that support these investments, as shown on slide ten.

Even at a 50% cumulative default rate and 50% severity assumption, *no losses are projected on these securities.*

\*\*\*

*From a business perspective, even in this difficult business environment, we continue to benefit from a relatively strong credit position.* We will have higher core spread income in the retained portfolio. We have taken steps to continue our mission and improve our business and we are experiencing significant growth and pricing power in our G-fee business. All of these business drivers will contribute to improved returns over the long-term.

(*emphasis added*)

39. Also during the Q3 2007 Conference Call, Defendant Piszel elaborated on

the Company's exposure to credit losses in its guarantee fee business:

Our guarantee fee business experienced a $7 billion pretax reduction in value, due to significant declines in the market value of the net guarantee asset and guarantee obligation and widening credit spreads and the lower market prices on our portfolio of delinquent loans. *This resulted in a GO that Patti referred to of approximately $17 billion, which overstates what we expect to become realized credit losses. A more reasonable outcome is $10 billion to $12 billion.* I think there was a glitch in Patti's script when she gave $10 to $20 billion. She meant $10 to $12 billion.

\*\*\*

*Given the opportunities to deploy capital, and uncertainty of our GAAP results and credit conditions, as well as uncertainties on the relief of the 30%, we are planning on taking several actions to bolster our capital.* First, we have engaged Lehman Brothers and Goldman Sachs to help us consider capital raising alternatives in the very near term. Second, we are seriously considering a 50% reduction in our common dividend. *These actions, coupled with other management steps, should provide sufficient capital flexibility for us to manage the Company for our shareholders and meet our charter through the balance of this credit downturn.* When things return to normal, we are committed to returning the excess capital to our shareholders. With that, let me turn things back to Dick.

(*emphasis added*)

40. On December 11, 2007, the Company participated in the Goldman Sachs

Financial Services Conference ("Goldman Sachs Conference"). At the Goldman Sachs

16

Conference, Defendant Syron discussed the strengths in the Company's risk management

and capital management:

> *The case historically has been that (inaudible) very, very low levels of interest rate and credit risk in our retained portfolio.* Specifically, 99% of the securities in the portfolio business, the one on your right, have security ratings of AAA or better in a duration gap over time. We focus a lot on duration that's average zero months. We're a matchbook provider. We don't bet on the direction of interest rates. We make money over the long term, through the core spread (inaudible) the portfolio.

> What's the takeaway? *The takeaway from this slide is that, over time, Freddie has succeeded in generating good returns from both our guarantee and investment businesses while keeping our risk exposures very low. We're a high-leverage, low-risk operation. This strategy has enabled us to profit with others when times are good and to help keep serving our mission, strengthen consumer ties, and build market share when times are tough, like they are now.*

> \*\*\*

> I can't stress this too much. Whereas the returns available to us in the retained portfolio were relatively unattractive throughout the 2004 to 2006 time, and a lot of business returns were unattractive, the ROEs on new business we achieved in the last year have been much, much better. *Now, while we're not aggressively growing the retained portfolio in the interest of being sure we keep our capital powder dry, we're not shrinking it either. And we've been able, as our assets roll over-- about $10 billion a month rolls over through the retained portfolio-- to replace that with more attractive business coming on.*

> *Finally, we feel that our credit position in the current guarantee book, actually, is very near the best of the entire industry. A very major reason for this is that we have very low exposures to alt A in risk-layered mortgage products in the guarantee business. We didn't do any subprime business.* And, if you look at layered products and alt A, they together amount to about 9% of our total guarantee portfolio. As a result, thus far, we have a delinquency rate-- a serious delinquency rate of about 51 basis points. The rate for the industry as a whole is about 100 basis points, or about 1%. So, if you look at that, and I think it is a valuable lead indicator, it shows the relative - relative - security of our portfolio. *Now, this combination of improved pricing and margins on new business with continued low risk in our existing portfolio is what we think bodes well for our future.*

*(emphasis added)*

41.    Defendant Piszel continued discussing the Company's high credit quality

during the Goldman Sachs Conference, saying:

> *This next slide makes the point about the high credit quality of the overall retained portfolio.* 99% of the portfolio is AAA or agency securities. We have no CDO exposure. At September 30, we had $105 billion-- that is the orange-- in AAA-backed ABS. We started the year at $125 billion, so that is paying off rather quickly. We also have $53 billion in alt A-backed ABS. Nearly all of the subprime and the alt A-backed is AAA, and both have significant subordination levels.

(*emphasis added*)

42.    On February 28, 2008, the Company filed its Information Statement and

Annual Report for Investors for the fiscal year ended December 31, 2007 ("2007

Information Statement"). In the 2007 Information Statement, Freddie Mac made several

statements stated regarding its capital position and liquidity:

> Because of our financial performance and our regular and significant participation as an issuer in the funding markets, our sources of liquidity have remained adequate to meet our needs and we anticipate that they will continue to be so.
>
> ***
>
> We estimate at December 31, 2007 that *we exceeded each of our regulatory capital requirements, in addition to the 30% mandatory target capital surplus.*
>
> ***
>
> If these measures are not sufficient to help us manage to the 30% mandatory target capital surplus, then we will consider additional measures in the future, such as limiting growth or reducing the size of our retained portfolio, slowing issuances of our credit guarantees, issuing preferred or convertible preferred stock, issuing common stock or further reducing our common stock dividend.

(*emphasis added*)

43.    In addition to statements about its capital position, Freddie Mac also

discussed its risk profile and underwriting standards in its 2007 Information Statement:

> Although Structured Transactions generally have underlying mortgage loans with a variety of risk characteristics, many of them may afford us credit protection from losses due to the underlying structure employed and additional credit enhancement features.

\*\*\*

Between December 31, 2007 and February 25, 2008, credit ratings for mortgage-related securities backed by subprime loans with an aggregate unpaid principal balance of $16 billion were downgraded by at least one nationally recognized statistical rating organization. In addition, there were $5 billion of unrealized losses, net of tax, associated with AAA-rated, nonagency mortgage-related securities backed by subprime collateral that are principally a result of decreased liquidity in the subprime market. The extent and duration of the decline in fair value of these securities relative to our cost have met our criteria that indicate the impairment of these securities is temporary.

\*\*\*

[I]n July 2007, we informed our customers of new underwriting and disclosure requirements for non-traditional mortgages. In September 2007, we informed our customers and other counterparties of similar new requirements for subprime short-term hybrid ARMs. These new requirements are consistent with our announcement in February 2007 that we would implement stricter investment standards for certain subprime ARMs originated after September 1, 2007, and develop new mortgage products providing lenders with more choices to offer subprime borrowers.

\*\*\*

We seek to manage institutional credit risk on non-Freddie Mac mortgage-related securities by only purchasing securities that meet our investment guidelines and performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. To assess the creditworthiness of these entities, we may perform additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures. In addition, we regularly evaluate our investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both.

44.     Defendants Syron and Piszel certified the 2007 Information Statement on

February 28, 2008. Their certifications stated:

1. I have reviewed this Information Statement of the Federal Home Loan Mortgage Corporation, or Freddie Mac;

2. Based on my knowledge, this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

19

statements were made, not misleading with respect to the period covered by this Information Statement; and

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this Information Statement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement.

45.     On February 28, 2008 the Company released a Supplement to its

Information Statement also dated February 28, 2008 ("February 28, 2008 Supplement").

The February 28, 2008 Supplement stated, in relevant part:

> Looking ahead to 2008, Syron commented, "We remain extremely cautious as we enter 2008. If the economy weakens substantially from here – a possibility for which we need to be prepared as a company – it will have a further negative effect on homeowners across the country and drive credit costs higher. *However, we have taken the steps to add capital, tighten our management of credit risk and institute pricing policies that are more consistent with the risk we bear*. These actions should help us build the business for the future."

> "*With our large capital raise in the fourth quarter, we boosted our surplus relative to OFHEO's 30 percent mandatory target capital surplus*," said Buddy Piszel, chief financial officer. "*In 2008, we will continue to prudently manage our capital, particularly given the outlook for continued weakening in the housing market*."

> ***

> **Core Capital**

> Estimated regulatory core capital was $37.9 billion at December 31, 2007, which represented an estimated $11.4 billion in excess of the company's regulatory minimum capital requirement, and an estimated $3.5 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

> ***

> In 2007, Freddie Mac financed homes for approximately 3.6 million families. *In addition to providing much needed liquidity, stability and affordability to the market, Freddie Mac has taken a leadership role in addressing some of the excesses of subprime lending, including taking early steps to enhance the level of underwriting standards in the market.*

20

(*emphasis added*)

46.     On May 14, 2008, the Company issued a Supplement to its Information

Statement dated February 28, 2008 ("May 14, 2008 Supplement"). The May 14, 2008

Supplement stated, in relevant part:

> "*Throughout the first quarter, Freddie Mac struck a careful balance of managing risk and seizing business opportunities*," said Buddy Piszel, chief financial officer. "*We continued to make prudent provision for credit losses, monitor our credit book closely and maintain our disciplined approach to managing interest-rate and other risks.* Our credit guarantee business saw strong, high quality growth -- and as the quarter ended, we also were able to significantly ramp up our mortgage purchase commitments for the retained portfolio.
>
> "*It's important to note that we began the year with a larger capital cushion compared to a year earlier, and during the quarter we put that capital to work, providing critically needed liquidity to the market and delivering attractive returns on equity for our business*," Piszel said. "Our plan is to raise new capital that will not only enable us to continue to serve our mission and meet the housing market's needs in this time of stress, but also to deploy that capital in a way that enhances business flexibility and strengthens our capital position.
>
> "We also made progress on a number of other important fronts, including beginning our registration process with the Securities and Exchange Commission and completing our remediation of all the previously identified material weaknesses in our controls environment," Piszel added. "*While our expectation is for continued weakness in the housing and economic environment to negatively impact our overall performance through the remainder of this year, we have put Freddie Mac on a better foundation to manage through the current cycle and emerge a successful, long-term competitor.*"

(*emphasis added*)

47.     Also on May 14, 2008, the Company released its Financial Report for the

Three Months Ended March 31, 2008 as a Supplement to its Information Statement dated

February 28, 2008 ("May 14, 2008 Financial Report"). The May 14, 2008 Financial

Report stated, in relevant part:

21

**Capital Adequacy**

On March 19, 2008, OFHEO, Fannie Mae and Freddie Mac announced an initiative to increase mortgage market liquidity. In conjunction with this initiative, OFHEO reduced our mandatory target capital surplus to 20% above our statutory minimum capital requirement, and we announced that we will begin the process to raise capital and maintain overall capital levels well in excess of requirements while the mortgage markets recover. *We estimated at March 31, 2008 that we exceeded each of our regulatory capital requirements, in addition to the 20% mandatory target capital surplus.*

\*\*\*

**Mortgage Credit Risk**

Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and the general economic environment. *To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements.*

All mortgages that we purchase for our retained portfolio or that we guarantee have an inherent risk of default. *We seek to manage the underlying risk by adequately pricing for the risk we assume using our underwriting and quality control processes. Our underwriting process evaluates mortgage loans using several critical risk characteristics, such as credit score, LTV ratio and occupancy type.*

*Underwriting and quality control standards*

We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, we provide originators with a series of mortgage underwriting standards and the originators represent and warrant to us that the mortgages sold to us meet these requirements. *We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage or make us whole in the event of a default.* In response to the changes in the residential mortgage market during the last year, we have made changes to our underwriting guidelines during the first quarter of 2008, which our seller/servicers must comply with for loans delivered to us for purchase or securitization. In February 2008, we announced that effective June 1, 2008 we would sharply reduce our purchases of mortgages with LTV ratios over 97%,

subject to exceptions for Home Possible mortgages with higher borrower credit scores and certain mortgages with federal insurance or guarantees. Our Home Possible program is designed to help finance first-time homebuyers by allowing lower loan requirements for those meeting the eligibility criteria. We also provided guidance on our pre-existing policy that maximum LTV ratios for many mortgages must be reduced in markets where home prices are declining. In some cases, binding commitments under existing customer contracts may delay the effective dates of underwriting adjustments.

*(**emphasis added**)*

48.     As part of the Company's May 14, 2008 Financial Report, Defendants

Syron and Piszel signed certifications stating:

> 1. I have reviewed this Information Statement Supplement of the Federal Home Loan Mortgage Corporation, or Freddie Mac;
>
> 2. Based on my knowledge, this Information Statement Supplement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Information Statement Supplement; and
>
> 3. Based on my knowledge, the unaudited consolidated financial statements, and other financial information included in this Information Statement Supplement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement Supplement.

49.     On May 20, 2008, the Company participated in the Eleventh Annual

Lehman Financial Services Conference ("May 20, 2008 Conference"). During the

conference, Defendant Piszel stated, "we have a very solid capital base. At the end of the

quarter, we were $5.5 billion -- actually, we were $6 billion higher than our regulatory

minimum, and we announced a commitment to raise about $5.5 billion in new capital,

and that will enable us to be able to fund growth and also give us downside protection,"

later continuing, "[a]t the end of the quarter, we had $38 billion in regulatory capital.

That was $11.5 billion over our statutory requirement, and we believe our capital position is very strong and very sound."

50.     On June 6, 2008, the Company held its Annual Stockholders' Meeting ("2008 Stockholders' Meeting"). At the meeting, Defendant Syron discussed the company's capital and explained that the Company had acted "prudently and decisively to protect and bolster our capital." Later, Defendant Syron stated, "The bottom line is that while our credit costs are increasing in this tough environment, *we believe they're manageable in any realistic scenario and mitigated by our revenue growth going forward.* Essentially, you have two buckets. You can think of the Freddie going forward. We have these great opportunities, better pricing, better spreads lifting us up in the drag down from some of the previous-year books." (*emphasis added*)

51.     The statements contained in ¶¶ 34 - 50 were materially false and misleading because:

> a.  Defendants misrepresented the Company's underwriting standards, risk management and the steps the Company took to protect itself from losses associated with mortgage loans;
>
> b.  Defendants concealed and misrepresented the Company's holdings in highly risky and non-performing securities related to residential mortgages, as well downplaying the Company's losses and write-downs associated with those holdings; and
>
> c.  Defendants misrepresented the adequacy of the Company's capital, the extent to which its capital position had deteriorated and its lack of liquidity.

24

52.     Additionally, during the Class Period, Defendants Syron and Piszel knowingly certified false and misleading financial statements.

## C.     The Truth Emerges

53.     On June 25, 2008, the Company issued its May Monthly Volume Summary ("May Volume Summary") that revealed that it had increased its "retained portfolio" by an annualized rate of 53.4%. After the market closed on June 25, 2008, Bloomberg News reported that the "cost of protecting the debt of Freddie Mac" from default had risen to its highest rate in more than three months. Following these disclosures, Freddie Mac shares fell $1.48 per share or 7.4% on moderately heavy trading to close at $18.53 per share on June 26, 2008 from a close of $20.01 per share on June 25, 2008

54.     On June 30, 2008, Mortgage Insurance Companies of America released information indicating that its members reported 67,967 defaults in May. According to the Associated Press, fears that Freddie Mac's and Fannie Mae's losses "could be worse were reinforced Monday as the Mortgage Insurance Companies of America, which represents companies PMI Group Inc. and MGIC Investment Corp. said defaults on loans backed by those companies rose to 68,000 in May, up 48 percent from a year earlier." On June 30, 2008, Freddie Mac shares dropped $1.45 or 8.12%, from a close of $17.85 per share on June 27, 2008 to a close of $16.40 per share on June 30, 2008.

55.     On July 7, 2008, Freddie Mac's stock tumbled after a Lehman Brothers report said that a pending accounting change could force the Company to account for securitized assets on its balance sheet – potentially forcing Freddie Mac to boost its capital by $29 billion. Thomas Lawler, a former Fannie Mae portfolio manager and founder of Lawler Economic & Housing Consulting, commented that the accounting

25

issue "piled on to other folks' previous estimates that the companies might be forced to take (losses)" on subprime and other risky mortgage assets. The market reacted strongly to the news, plummeting $2.59 per share or 17.86%, on heavy volume, from $14.50 per share at close on July 3, 2008 to $11.91 per share at close on July 7, 2008.

56. Freddie Mac stock slid further on July 9, 2008, losing $3.20 per share in value, or 23.77%, to close at $10.26 per share amid media reports of renewed worries on whether Freddie Mac could withstand more losses as well as concerns that it might need to raise massive amounts of new capital. The stock continued its drop on July 10, 2008, after former St. Louis Federal Reserve President William Poole told Bloomberg News the Company was "insolvent" under fair accounting rules and that it may need a government bailout. On this news, the Company's stock lost an additional $2.26 per share, or 22.03%, to close at $8.00 per share.

57. The Company's stock continued to drop in value the following week, following renewed indications that Freddie Mac would need a government bailout. The Treasury Department and Federal Reserve outlined plans over the weekend to provide lending support to the Company. As a result, by the close of trading on Monday, July 14, 2008, Freddie Mac shares had dropped 8.26% or $0.64 per share to close at $7.11 per share, down from their close on Friday, July 11, 2008 at $7.75 per share.

58. On July 15, 2008, the Securities and Exchange Commission announced an emergency rule aimed at stopping "naked" short selling of the Company's shares. On this news, Freddie Mac's shares declined from $7.11 per share on July 14, 2008 to $5.26 per share at close on July 15, 2008, for a total loss of $1.85 per share, or 26.02%.

59.     Freddie Mac's stock price fell again as the news hit the market on July 24, 2008 that the U.S. House of Representatives had passed a massive bailout plan for Freddie Mac and its fellow GSE, Fannie Mae. The Company's stock suffered a sharp initial decline of $1.99 per share, or 18% on July 24, 2008, and continued to drop over the next several days to close at $7.72 per share on July 28, 2008.

60.     On August 6, 2008, the Company more fully revealed the extent of its exposure to the deteriorating mortgage markets when it announced a huge, $821 million loss – marking the fourth straight quarter of losses for the Company and piling up a total of $4.6 billion in losses. Freddie Mac also announced that it had increased its reserve for credit losses by $2.8 billion, more than double the amount set aside in the first quarter. Meanwhile, Fitch Ratings lowered Freddie Mac's preferred stock to A from A+ and placed it on ratings watch negative. The news shocked the market, and Freddie Mac's share price plunged on heavy trading from $8.04 per share at close on August 5, 2008 to $6.49 per share at close on August 6, 2008, a loss of $1.55 per share, or 19%.

## ADDITIONAL *SCIENTER* ALLEGATIONS

61.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants. The Individual Defendants were motivated to materially misrepresent the true nature of the Company's business, operations, and financial affairs to the public and regulators in order to keep the Company's share price artificially high.

27

62.     The Individual Defendants further benefited from the Company's artificially high stock prices when they sold shares of Company stock – Syron, Cook and Piszel collectively sold 68,924 shares during the Class Period for proceeds totaling $1.88 million. Syron, in particular, sold 44,082 shares during the Class Period for proceeds of $1.16 million. If the Individual Defendants had disclosed the true extent of Freddie Mac's losses and its inadequate capitalization in a timely manner, the stock price would have fallen and Individual Defendants' profits from their stock sales would have been significantly less.

## LOSS CAUSATION / ECONOMIC LOSS

63.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Freddie Mac's financial situation was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. That decline in Freddie Mac's common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.,* damages, suffered by the Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the

28

Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

64.    At all times relevant, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading because they failed to disclose a true and accurate picture of Freddie Mac's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Freddie Mac's common stock price to be artificially inflated. Plaintiff and other Class members purchased Freddie Mac's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who acquired Freddie Mac common stock from November 21, 2007 through and including August 5, 2008, and who were damaged thereby ("Class"). Excluded from the Class are the Defendants, the Company's officers and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity in which any of the Defendants has a controlling interest or of which the Company is a parent or subsidiary.

66.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company had more than 640 million shares of its common stock outstanding,

which were actively traded on the NYSE. Although the exact number of Class members

is unknown at this time and can only be ascertained through appropriate discovery,

Plaintiff believes there are thousands of members of the Class who traded Company

common stock during the Class Period.

67. Common questions of law and fact exist as to all members of the Class

and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

> (a) Whether Defendants violated federal securities laws based upon the facts alleged herein;
>
> (b) Whether Defendants acted knowingly or recklessly in making materially misleading statements and/or omissions during the Class Period;
>
> (c) Whether the market prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
>
> (d) Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

68. Plaintiff's claims are typical of the claims of the members of the Class as

Plaintiff and members of the Class sustained damages arising out of Defendants'

wrongful conduct in violation of federal laws as complained of herein.

69. Plaintiff will fairly and adequately protect the interests of the members of

the Class and has retained counsel competent and experienced in class and securities

litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

70. A class action is superior to other available methods for the fair and

efficient adjudication of this controversy since joinder of all members of this Class is

impracticable. Furthermore, because the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it

impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the market doctrine in that:

> (a)     Defendants failed to disclose material facts during the Class Period;

> (b)     Freddie Mac's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

> (c)     Freddie Mac made available periodic public reports about its financial results and condition;

> (d)     Freddie Mac regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

> (e)     Freddie Mac was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace;

> (f)     the misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

31

(g)     Plaintiff and members of the Class purchased their Company stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

72.     Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

73.     As a result of the foregoing, the market for Freddie Mac's securities promptly digested current information regarding Freddie Mac from all publicly-available sources and reflected such information in the price of Freddie Mac's securities. Under those circumstances, all purchasers of Freddie Mac's securities during the Class Period suffered similar injury through their purchase of Freddie Mac's securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because,

32

at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Freddie Mac who knew that those statements were false, misleading or omitted necessary information when they were made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

75. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

77. During the Class Period, Defendants, singly and in concert, directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and course of business which operated as fraud and deceit upon Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class. The purpose and effect of said scheme, plan and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase Freddie Mac's common stock during the Class Period at artificially inflated prices.

78. Throughout the Class Period, Freddie Mac acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its

33

valid representatives. The willfulness, motive, knowledge and recklessness of the Individual Defendants are therefore imputed to Freddie Mac, which is primarily liable for the securities law violations of the Individual Defendants.

79.     As a result of the failure to disclose material facts, the information Defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price of Freddie Mac's common stock was artificially inflated during the Class Period. In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price of Freddie Mac's common stock in purchasing shares of the Company. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

80.     Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

81.     By reason of the foregoing, Defendants directly violated Section 10(b)-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of Freddie Mac's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

82.     Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

83.     The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

84.     The Individual Defendants have the power and influence and exercised the same to cause Freddie Mac to engage in the illegal conduct and practices complained of herein.

85.     By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of Freddie Mac's common stock during the Class Period.

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)     Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: August 15, 2008

**ROY JACOBS & ASSOCIATES**

By: _____

Roy L. Jacobs (RLJ-0286)

60 East 42nd Street, 46th Floor
New York, NY 10165
Tel. (212) 867-1156
Fax (212) 504-8343
rjacobs@jacobsclasslaw.com

and

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz  (LP-7324)
60 East 42nd Street, 46th Floor
New York, NY 10165
Tel. (212) 685-0969
Fax (212) 685-2306
lpaskowitz@pasklaw.com

ATTORNEYS FOR PLAINTIFF

OF COUNSEL:

**BERMAN DEVALERIO PEASE**

**TABACCO BURT & PUCILLO**
Jeffrey C. Block (JBC0387)
Autumn W. Smith
Nathaniel L. Orenstein
Justin N. Saif
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

## PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint against the Federal Home Loan Mortgage Corp. (Freddie Mac") and certain other defendants.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.    Plaintiff made the following transactions during the Class Period (November 21, 2007 through August 5, 2008) in the common shares of Freddie Mac:

| Purchases | | | | Sales | | |
|-----------|--|--|--|-------|--|--|
| **Date(s)** | **Number of Shares** | **Price** | | **Date(s)** | **Number of Shares** | **Price** |
| 07/21/2008 | 50 | 9.24 | | | | |
| 07/24/2008 | 40 | 11.44 | | | | |
| 07/28/2008 | 40 | 8.56 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.    I declare under penalty of perjury, this _14__ day of August, 2008 that the information above is accurate.

_____     Jino Kuriakose
            E-signed