UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

JINO KURIAKOSE, Individually and On
Behalf of All Others Similarly Situated,

                    Plaintiff,

      vs.

FEDERAL HOME LOAN MORTGAGE
COMPANY, RICHARD SYRON, PATRICIA
L. COOK, and ANTHONY S. PISZEL,

                Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:08-cv-7281 (JFK)

LEAD PLAINTIFF'S MOTION TO
PARTIALLY LIFT THE PSLRA
DISCOVERY STAY AND
INCORPORATED MEMORANDUM OF
LAW IN SUPPORT THEREOF

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................2

    A.    Procedural Background.......................................................................2

    B.    The Government Investigations ........................................................3

III.  ARGUMENT .....................................................................................................7

    A.    Courts Have Explicit Authority to Modify the PSLRA's Discovery Stay ..............7

    B.    Courts Routinely Modify the Discovery Stay Under Similar Circumstances ........7

    C.    Lead Plaintiff's Proposed Discovery Is "Particularized"..........................9

    D.    Plaintiff Will Be Unduly Prejudiced Without Modification of the PSLRA Stay .........10

    E.    Modification of the PSLRA Discovery Stay Will Not Impose an Undue Burden on Defendants........................16

IV.   CONCLUSION...............................................................................................20

## TABLE OF AUTHORITIES

**CASES**

*Chambers v. Capital Cities/ABC*,
159 F.R.D. 441 (S.D.N.Y. 1995) .................................................................14, 15

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
No. 05-MD-1725, 2007 U.S. Dist. LEXIS 10408 (E.D. Mich. Feb. 15, 2007) .........7, 9, 10

*In re Enron Sec. Derivative & "ERISA" Litig.*,
No. MDL 1446, H-01-3624, 2002 U.S. Dist. LEXIS 26261 (S.D. Tex. Aug. 16, 2002) ......................................................................................................8, 18, 19

*In re FirstEnergy Corp. Sec. Litig.*,
229 F.R.D. 541 (N.D. Ohio 2004) ............................................................. *passim*

*In re Flir Sys. Inc. Sec. Litig.*,
No. 00-360-HA, 2000 WL 33201904 (D. Or. Dec. 13, 2000)....................................14, 15

*In re JDS Uniphase Corp. Sec. Litig.*,
238 F. Supp. 2d 1127 (N.D. Cal. 2002) ....................................................13, 14

*In re LaBranche Sec. Litig.*,
333 F. Supp. 2d 178 (S.D.N.Y. 2004) *cert denied*, 128 S. Ct. 1702 (2008) ......2, 10, 11, 19

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
220 F.R.D. 246 (D. Md. 2004)....................................................................6, 10

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
No. 04-374 (JWB), 2005 U.S. Dist. LEXIS 37962 (D.N.J. Feb. 15, 2005)........................8

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
No. MDL 00-MD-1335-B, 2003 WL 23830479 (D.N.H. Jan. 29, 2003)........................10

*In re Tyco Int'l, Ltd. Sec. Litig.*,
No. MDL00-MD-1335-B, 2000 U.S. Dist. LEXIS 11659 (D.N.H. July 27, 2000) ......................................................................................................9

*In re Williams Sec. Litig.*,
No. 02-CV-72H (M), 2003 U.S. Dist. LEXIS 24304 (N.D. Okla. May 22, 2003) ......................................................................................................10

*In re WorldCom, Inc. Sec. Litig.*,
234 F. Supp. 2d 301 (S.D.N.Y. 2002).......................................................... *passim*

ii

*Seippel v. Sidley, Austin, Brown & Wood LLP*,
    No. 03 Civ. 6942 (SAS), 2005 U.S. Dist. LEXIS 2388 (S.D.N.Y. Feb. 17,
    2005) .................................................................................................................7

*Singer v. Nicor, Inc.*,
    No. 02C5168,  2003 U.S. Dist. LEXIS 26189 (N.D. Ill. Apr. 23, 2003)................8, 12, 17

*Vacold LL & Immunotherapy, Inc. v. Cerami*,
    No. 00Civ.4024 (AGS), 2001 WL 167704 (S.D.N.Y. Feb. 16, 2001) ...............................8

*Waldman v. Wachovia Corp.*,
    No. 08 Civ. 2913 (SAS), 2009 WL 86763 (S.D.N.Y. Jan. 12, 2009)...............................17


**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78u-4(b)(3)(B)........................................................................................ *passim*


**LEGISLATIVE HISTORY**

H.R. REP. No. 104-369 (1995)................................................................................7, 8

S. REP. No. 104-98 (1995) ...........................................................................................8


**SECONDARY AUTHORITIES**

Charles Duhigg, *U.S. Likely to Keep the Reins on Fannie and Freddie*, N.Y. Times,
    March 2, 2009 ......................................................................................................12

*Freddie Mac Posts $23.9 Billion Loss; More Aid Wanted*, N.Y. Times, March 12,
    2009......................................................................................................................12

Saskia Scholtes, *Freddie Mac chief quits after six months*, Financial Times, March 3,
    2009......................................................................................................................12

I.    **INTRODUCTION**

> *"... the GSE [Fannie Mae and Freddie Mac] propaganda machine purposefully misled people into believing that it was keeping risk low and operating under an adequate prudential regulatory regime."*
> The Last Trillion Dollar Commitment – The Destruction of Fannie Mae and Freddie Mac, Peter J. Wallison, the Arthur F. Burns Fellow in Financial Policy Studies at the American Enterprise Institute, and Charles W. Calomiris, the Henry Kaufman Professor of Financial Institutions at Columbia Business School, January 25, 2009

This conclusion regarding the fraud committed by the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") is typical of the multitude of similar conclusions drawn by the government agencies, experts and scholars given access to the documents Lead Plaintiff seeks access to from this Court. The documents sought have already been gathered, reviewed, organized and produced by Freddie Mac such that any burden of re-producing them in this case is *de minimus*.

Accordingly, Lead Plaintiff seeks an order partially lifting the Private Securities Litigation Reform Act ("PSLRA") discovery stay to obtain the very documents and information defendants have produced, or are currently obligated to produce, pursuant to the current, ongoing investigations by the Securities and Exchange Commission ("SEC"), the U.S. Attorney's Offices for the Southern District of New York and the Eastern District of Virginia, and the House of Representatives Committee on Oversight and Government Reform (the "House Committee") (collectively, the "government investigators"). The aforementioned investigations relate to the very wrongdoing underlying the instant litigation.

While the PSLRA stays discovery pending a ruling on a motion to dismiss, the stay is far from absolute. 15 U.S.C. §78u-4(b)(3)(B). Indeed, courts frequently lift the discovery stay to allow plaintiffs to receive copies of documents and testimony produced by defendants in government investigations parallel to securities class actions. *See, e.g., In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) ("maintaining the discovery stay as to materials already provided

to government entities does not further the policies behind the PSLRA"); *In re LaBranche Sec.*
*Litig.*, 333 F. Supp. 2d 178, 183-84 (S.D.N.Y. 2004) *cert. denied*, 128 S. Ct. 1702 (2008).

Lead Plaintiff therefore respectfully requests that the Court lift the stay to permit Lead
Plaintiff to obtain copies of testimony, documents and any other information produced by, or to be
produced by, defendants to the government investigators because: (1) the documents and information
sought are limited and sufficiently "particularized;" (2) Lead Plaintiff and the class are at risk of
undue prejudice unless they are permitted to review these probative documents; and (3) there is no
burden on defendants simply to re-produce additional copies of documents and other information
already identified, organized and produced (or in the process of being produced) to the government
investigators.[1]

## II.    BACKGROUND

### A. Procedural Background

Lead Plaintiff's Complaint (the "Complaint") in this action was filed on behalf of all
purchasers of the publicly traded common stock of Freddie Mac from November 21, 2007 through
and including August 5, 2008 (the "Class Period").[2]  The Complaint alleges that Defendants, acting
with scienter, made numerous false and misleading statements to investors concerning the

---

[1] Due to the obvious and demonstrable overlap between the allegations in this case and the
government investigations, defendants' production of the narrow and limited discovery sought by
Lead Plaintiff makes sense – particularly given that Lead Plaintiff agrees to bear the reasonable costs
of the production. *See FirstEnergy*, 229 F.R.D. at 545 n.5 ("Furthermore, the Court notes that Lead
Plaintiff has agreed to bear the costs of copying materials already provided to the government
investigators and the federal grand jury.").

[2] Defendants in this Action are Freddie Mac, Richard Syron ("Syron"), Patricia L. Cook ("Cook"),
and Anthony S. Piszel ("Piszel") (Freddie Mac, Syron, Cook, and Piszel are sometimes collectively
referred to as "Defendants").

Company's financial performance, including the Company's exposure to the deteriorating subprime mortgage market as well as its risk management and sufficiency of its capital resources. The Complaint alleges claims under the Securities Exchange Act of 1934 (the "Exchange Act") and seeks damages suffered by Freddie Mac's shareholders when the true facts regarding the Company's financial condition and true business prospects were revealed to the public through a series of partial disclosure events. Freddie Mac's fraud, and the dire financial consequences emanating from the discovery of such fraud, are the subjects of the investigations now being conducted by the government investigators and are an essential part of the factual underpinnings of this case.

Following consolidation, appointment of Central States, Southeast and Southwest Areas Pension Fund ("Central States") as Lead Plaintiff, and appointment of Coughlin Stoia Geller Rudman & Robbins, LLP as lead counsel, the Court permitted the Federal Housing Finance Agency (the "FHFA"), which is the conservator for Freddie Mac, to intervene in this case. *See* Orders dated November 24, 2008 (DE 65) and February 6, 2009 (DE 87). The Court then granted the FHFA's motion for a 45 day stay pursuant to 12 U.S.C. §4617, which expired March 23, 2009. *See* Order dated February 6, 2009 (DE 88).

### B. The Government Investigations

By now, it is common knowledge that Freddie Mac perpetrated a multi-billion dollar fraud on the Company's shareholders and the American public that likely exacerbated the collapse of the United States housing market:

> "I would also note that the reason people like me didn't complain about this in 2005 and 2006 was that *they [Fannie Mae and Freddie Mac] had adopted accounting principles that masked these by the way they defined subprime and Alt-A lending.*"
> Testimony of Charles W. Calomiris before the Committee on Oversight and Government Reform, United States House of Representatives, December 9, 2008.

> "For historical reasons, these loans [Alt-A, subprime and other non-prime loans] are also carried in databases as prime loans when they were purchased by Fannie and Freddie, which conveniently allowed them to deny that they were active in the

3

subprime market. ***This created tremendous disclosure problems for the industry, since a massive portion of subprime, Alt-A and other non-prime lending has long been hidden behind Fannie and Freddie's "prime" façade.***"
Written Statement of Edward J. Pinto, Former Chief Credit Officer of Fannie Mae (1987-1989), before the Committee on Oversight and Government Reform, United States House of Representatives, December 9, 2008.

"***In retrospect and despite OFHEO's surplus capital requirements, portfolio caps, and repeated warnings about credit risks, the credit profile of both Enterprises followed the market down in 2006 and 2007 – without commensurate pricing for risk.***"
Written Statement of the Honorable James B. Lockhart, III, Director of the Federal Housing Finance Agency, before the Senate Committee on Banking, Housing and Urban Affairs, September 23, 2008.

"As the numerous GSE accounting scandals illustrate, accounting transparency has never been a strength of the GSE's; ***not surprisingly, the GSE's did not disclose the extent of their subprime and Alt-A exposures to the market.***"
Written Statement of Charles W. Calomiris presented to the Committee on Oversight and Government Reform, United States House of Representatives, December 9, 2008.

As set forth in the Complaint, throughout the Class Period, Defendants misrepresented to investors the Company's enormous exposure to mortgage-related losses, poor underwriting standards and risk management procedures and the resulting negative impact to its capital adequacy. Freddie Mac took on massive exposure to subprime and other nontraditional, risky loans, in particular "Alt-A" loans, which are given to borrowers with better-than-subprime credit scores but without full documentation. At the same time, the Company failed to maintain an adequate capital cushion, which is a crucial safety net to protect against a downturn in housing prices.

Defendants received internal warnings as early as 2004 that Freddie Mac's shoddy underwriting standards, virtually non-existent risk management procedures and resulting purchase of low-quality, risky mortgages and mortgage-backed securities had left it exposed to massive losses. Similarly, Defendants knew, or recklessly disregarded, that Freddie Mac's capital base was insufficient. Yet, Defendants falsely reassured investors as to the soundness of Freddie Mac's mortgage portfolio, its underwriting and risk management and the sufficiency of its capital.

When the housing market deteriorated in 2007 (due in large part to the very subprime mortgage boom Freddie Mac helped create), Freddie Mac's huge exposure to subprime and Alt-A mortgages and thin capitalization left it in an increasingly perilous financial position. As housing prices plummeted and borrowers defaulted in droves, Defendants continued to mislead investors as to Freddie Mac's exposure to mortgage-related losses and the negative effects on its capital. The impact of Freddie Mac's massive losses on its mortgage holdings and failure to maintain an adequate capital base has been dire: the Company is now in such feeble condition that the federal government has placed the company into conservatorship and provided it with approximately $14 billion in taxpayer-financed bailout money. Defendants' fraud also caused shareholders to lose billions when Freddie Mac's stock price collapsed.

These events triggered investigations by the House Committee, the U.S. Attorney's Offices for the Southern District of New York and the Eastern District of Virginia, and the SEC. Significantly, the focus of these government investigations are essentially the same acts, individuals, and timeframe underlying the claims in this case.

On December 9, 2008, the House Committee held a hearing on "The Role of Fannie Mae and Freddie Mac in the Financial Crisis." As part of the investigation leading up to the hearing, the House Committee obtained nearly 400,000 documents from Fannie Mae and Freddie Mac (the "Committee Investigation Documents"). According to the opening statement of Committee Chairman Henry A. Waxman, those documents **"make clear that Fannie Mae and Freddie Mac knew what they were doing"** and that **"[t]heir own risk managers raised warning after warning about the dangers of investing heavily in the subprime and alternative mortgage market."** Defendant Syron testified at the hearing. *See* Statement of Richard F. Syron Before the Committee

on Oversight and Government Reform, United States House of Representatives, December 9, 2008, Exhibit 1 to the Declaration of David J. George ("George Dec.").

Freddie Mac is also being investigated by the SEC and the United States Attorney's Offices for the Southern District of New York and the Eastern District of Virginia. Specifically, in a Form 8-K filed with the SEC on September 29, 2008, Freddie Mac indicated that it received a federal grand jury subpoena from the United States Attorney's Office for the Southern District of New York and a notice from the Enforcement Division of the SEC indicating that the Enforcement Division is conducting an inquiry. *See* Exhibit 2 to the George Dec. The same filing also disclosed that the "subpoena seeks documents relating to accounting, disclosure and corporate governance matters for the period January 1, 2007 to the present." *Id.* Freddie Mac indicated that it "will cooperate fully in these matters." *Id.* Additionally, in a March 11, 2009 Form 10-K filed with the SEC, Freddie Mac disclosed that it also was the subject of an investigation by the United States Attorney's Office for the Eastern District of Virginia. *See* Exhibit 3 to the George Dec.

The fact that the SEC, the U.S. Attorney's Offices and the House Committee are all investigating the very acts underlying the claims in this case is a powerful indicator that Lead Plaintiff has not filed a "frivolous securities class action[] in the hope either that corporate defendants will settle th[e] action[] rather than bear the high cost of discovery." *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 249 (D. Md. 2004). Quite to the contrary – any burden on Freddie Mac would be, at most, *de minimus*.

## III.    ARGUMENT

### A.    Courts Have Explicit Authority to Modify the PSLRA's Discovery Stay

While the PSLRA provides that discovery in a securities fraud class action is stayed while a motion to dismiss is pending,[3] the legislative history of the PSLRA indicates that Congress enacted the discovery stay to prevent plaintiffs from filing securities class actions with the intent of using the discovery process to force a coercive settlement. *See* H.R. REPT. NO. 104-369 (1995).[4] As a result, the PSLRA explicitly provides this Court with discretion to allow discovery to go forward prior to its judicial determination of the sufficiency of the Complaint. *See In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, No. 05-MD-1725, 2007 U.S. Dist. LEXIS 10408, at *13 (E.D. Mich. Feb. 15, 2007) (noting that if Congress had intended an absolute stay on discovery, it would not have authorized a judicial reprieve).[5]

### B.    Courts Routinely Modify the Discovery Stay Under Similar Circumstances

Courts have not hesitated to modify the discovery stay in other securities class actions involving concurrent investigations by governmental agencies when doing so would not frustrate the purposes of the PSLRA. *See, e.g.*, *Seippel v. Sidley, Austin, Brown & Wood LLP*, No. 03 Civ. 6942 (SAS), 2005 U.S. Dist. LEXIS 2388, *4-*6 (S.D.N.Y. Feb. 17, 2005) (modifying stay as to

---

[3] 15 U.S.C. §78u-4(b)(3)(B) provides, impertinent part, that:

In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

[4] Unless stated otherwise herein, internal quotations and citations are omitted and all emphasis is added.

[5] Pursuant to the Stipulation and Order to Respond to the Consolidated Briefing Schedule dated March 31, 2009 [DE 96], Lead Plaintiff shall file a Consolidated Complaint by May 19, 2009.

documents already produced to the government, on ground that cost of such discovery to defendants is minimal because the documents have already been compiled for production, while plaintiffs would suffer severe prejudice if discovery is delayed while government investigations and other lawsuits proceed ahead of them); *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374 (JWB), 2005 U.S. Dist. LEXIS 37962, at *4 (D.N.J. Feb. 15, 2005) (lifting PSLRA discovery stay and ordering production of all documents produced by defendants to various government agencies, such as SEC, and/or any other regulatory, legislative or governmental entity both inside and outside the United States); *FirstEnergy*, 229 F.R.D. at 545 (lifting  discovery stay to permit lead plaintiffs to obtain documents already produced by First Energy to government entities); *Singer v. Nicor, Inc.*, No. 02C5168,  2003 U.S. Dist. LEXIS 26189, at *2 (N.D. Ill. Apr. 23, 2003) (lifting discovery stay because plaintiffs would be unfairly disadvantaged if they did not have access to documents previously provided to SEC, Illinois Attorney General, and other government agencies); *In re Enron Sec. Derivative & "ERISA" Litig.*, No. MDL 1446, H-01-3624, 2002 U.S. Dist. LEXIS 26261, at *1 (S.D. Tex. Aug. 16, 2002) (lifting stay as to materials already made available to numerous government agencies and others); *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (citing H.R. REP. NO. 104-369, at 37 and S. REP. NO. 104-98, at 14 (1995)); *see also Vacold LL & Immunotherapy, Inc. v. Cerami*, No. 00Civ.4024 (AGS), 2001 WL 167704, at *7 (S.D.N.Y. Feb. 16, 2001) (modifying discovery stay where request "does not implicate a concern that plaintiffs are seeking discovery to coerce a settlement or to support a claim not alleged in the Complaint.").

As demonstrated below, Lead Plaintiff's particularized, limited discovery requests to Defendants fall squarely within the Congressionally-created exceptions to the PSLRA discovery stay. Moreover, this action is a far cry from the "frivolous" actions that caught Congress' attention.

Lead Plaintiff does not seek discovery in the hopes of finding "some sustainable claim not alleged in the complaint" or as leverage to coerce defendants into settling meritless claims rather than bear the high costs of discovery. *See In re Delphi*, 2007 U.S. Dist. LEXIS 10408, at *12-*13 (granting lead plaintiffs' request for a partial modification of discovery stay). To the contrary, the documents and information already produced by Freddie Mac to the government investigators corroborate the precise claims asserted by Lead Plaintiff. Lead Plaintiff seeks nothing more than copies of what Freddie Mac has already produced. Given the likelihood that this universe of documents already exists in electronic form, it should literally take only minutes to be copied and re-produced.

**C.    Lead Plaintiff's Proposed Discovery Is "Particularized"**

The first requirement to lifting the PSLRA discovery stay is a request for "particularized discovery." 15 U.S.C. §78u-4(b)(3)(B). This requirement is fulfilled when the discovery requested satisfies a two-prong test: first, the request should be "directed at specific persons" and second, the request must "identif[y] specific types of evidence that fall within its scope." *In re Tyco Int'l, Ltd. Sec. Litig.*, No. MDL00-MD-1335-B, 2000 U.S. Dist. LEXIS 11659, at *12 (D.N.H. July 27, 2000) (analyzing requirement in context of preservation of subpoenas to third parties). Here, Lead Plaintiff's request satisfies both prongs. Lead Plaintiff merely requests that Defendants produce the closed universe of precisely the same documents and information they provided to the House Committee, the U.S. Attorneys' offices and the SEC. Lead Plaintiff is not requesting that Defendants produce documents that do not relate to the Complaint's existing allegations, or documents that have not already been gathered, vetted, and produced to the government

investigators.[6] Thus, Lead Plaintiff satisfies the "particularized discovery" requirement. *See In re Delphi*, 2007 U.S. Dist. LEXIS 10408, at *14-*18 (finding requests were particularized where they sought closed universe of materials Delphi already assembled and produced to the investigators and federal authorities); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. MDL 00-MD-1335-B, 2003 WL 23830479, at *4 (D.N.H. Jan. 29, 2003) ("discovery is 'particularized' because it is limited to the discovery documents that have already been produced to others").

### D.   Plaintiff Will Be Unduly Prejudiced Without Modification of the PSLRA Stay

The second requirement to lifting the PSLRA discovery stay is that the discovery "is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. §78u-4(b)(3)(B). This requirement is best interpreted "in light of Congress's purposes in passing the PSLRA" because the term, "undue prejudice," is not defined in 15 U.S.C. §78u-4(b)(3)(B). *Royal Ahold*, 220 F.R.D. at 247-50; *In re Williams Sec. Litig.*, No. 02-CV-72H (M), 2003 U.S. Dist. LEXIS 24304, at *15 (N.D. Okla. May 22, 2003). Congress specifically left the issue of whether prejudice is "undue" to the courts to resolve because "the Court must consider all the facts and circumstances presented by each particular case." *Id.* at *14-*15. Plaintiffs need not show irreparable harm to prove undue prejudice, but rather "improper or unfair treatment" under the circumstances. *In re Delphi*, 2007 U.S. Dist. LEXIS 10408, at *20.

In determining whether to lift the discovery stay, courts look at whether plaintiffs are "unduly prejudiced" by inability to access documents essential to make informed decisions regarding litigation strategy. *See LaBranche*, 333 F. Supp. 2d at 183-84 (granting motion to lift the PSLRA

---

[6] To the extent the Defendants claim that any documents produced to the government investigators are confidential, Lead Plaintiff is willing, ready and able to enter into an appropriate confidentiality stipulation.

discovery stay where "[t]he requested discovery [was] essential to determine [litigation] strategy and to assist in formulating an appropriate settlement demand"). In *LaBranche*, Judge Sweet noted that courts in this district find undue prejudice where plaintiffs are "'prejudiced by their inability to make informed decisions about their litigation strategy in *a rapidly shifting landscape*' and when they are effectively 'the only major interested party in the criminal and civil proceedings . . . without access to documents that currently form the core of those proceedings.'" *Id.* at 182 (quoting *WorldCom*, 234 F. Supp. 2d at 305). In *LaBranche*, both the SEC and the New York Stock Exchange ("NYSE") had undertaken investigations parallel to the securities class action. As a result of the SEC and NYSE investigations, the securities class action corporate defendant agreed to settle the regulators' claims. Judge Sweet found that the corporate defendant's settlement with the regulators made it essential for the securities class action plaintiffs to gain access to discovery.

In *WorldCom*, which Judge Sweet relied upon in *LaBranche*, Judge Cote found that "[w]ithout access to documents already made available to the U.S. Attorney [and] the SEC . . . [lead plaintiff] would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape." 234 F. Supp. 2d at 305. The court was particularly concerned that lead plaintiff "would essentially be the only major interested party in the criminal and civil proceedings against WorldCom without access to documents that currently form the core of those proceedings[]" and that "[i]f [lead plaintiff] must wait until the resolution of a motion to dismiss to obtain discovery and formulate its settlement or litigation strategy, it face[d] the very real risk that it w[ould] be left to pursue its action against defendants who no longer have anything or at least as much to offer." *Id.* at 306. The court thus ordered that certain documents produced to investigators be produced to lead plaintiff. *Id.*

Similarly, in *In re FirstEnergy* the court found that the plaintiffs in the securities class action would be unduly prejudiced without access to documents already made available to governmental entities because the securities plaintiffs would not be in a position to pursue informed litigation and settlement strategies. *In re FirstEnergy*, 229 F.R.D. at 545; *accord Singer*, 2003 U.S. Dist. LEXIS 26189, at *5 ("Plaintiffs here may well be unfairly disadvantaged if they do not have access to the documents that the governmental and other agencies already have during the pendency of the motion to dismiss.").

Here, prejudice to Lead Plaintiff is at least as severe as in the above cases where the courts have lifted the stay. Simply put, Freddie Mac is the archetypal "rapidly shifting landscape." In addition to being the subject of investigations by two separate United States Attorney's Offices, the Congress and the SEC, it currently is under the conservatorship of the FHFA and it is uncertain whether it will be placed into receivership or fully taken over by the federal government. *See* Charles Duhigg, *U.S. Likely to Keep the Reins on Fannie and Freddie*, N.Y. Times, March 2, 2009 ("Despite assurances that the takeover of Fannie Mae and Freddie Mac would be temporary, the giant mortgage companies will most likely never fully return to private hands, lawmakers and company executives are beginning to quietly acknowledge."). Its Chief Executive Officer, David Moffett, suddenly resigned on March 2, 2009 after just six months on the job. Saskia Scholtes, *Freddie Mac chief quits after six months*, Financial Times, March 2, 2009; *See* Exhibit 4 to the George Dec. Furthermore, in addition to the $13.8 billion in federal aid Freddie Mac has already received, after posting a $23.9 billion 2008 fourth quarter loss, Freddie Mac has requested $30.8 billion more from the federal government. *Freddie Mac Posts $23.9 Billion Loss; More Aid Wanted*, Associated Press, March 12, 2009; *See* Exhibit 5 to the George Dec. For these reasons, "[i]f [Lead Plaintiff] must wait until the resolution of a motion to dismiss to obtain discovery and formulate its

settlement or litigation strategy, it faces the very real risk that it will be left to pursue its action against defendants who no longer have anything or at least as much to offer." *WorldCom*, 234 F. Supp. 2d at 306. Also, if Freddie Mac is placed under receivership, Lead Plaintiff will be further prejudiced by being subject to the bankruptcy court's discovery stay.

Furthermore, Freddie Mac has attempted to conceal information and prevent factual investigation by specifically contractually prohibiting former employees from cooperating with shareholders bringing claims against the company. Specifically, Lead Plaintiff has encountered many obstacles in collecting evidence against Freddie Mac because the Company induced its former employees to sign severance agreements incorporating "Non Participation" clauses including the following language:

> You acknowledge that in the absence of this agreement you have the right voluntarily to assist others in bringing claims against the released parties. By signing below, you agree to waive this right. Therefore, except as otherwise provided in the agreement, you agree that you will not encourage, counsel or assist any attorney, their clients, or any other person (including current or former Freddie Mac employees) in bringing or prosecuting any claim, charges, or complaints against the released parties, unless pursuant to a valid subpoena or court order to produce documents or testify, or unless you have been requested by an agency of the United States government or state or local government (collectively "government agency") to assist in a government agency investigation or proceeding. To the extent that you are requested by any government agency to participate or assist in a government agency investigation or proceeding, or to the extent that any law may prohibit you from waiving your right to bring or participate in the investigation of a claim, you nevertheless waive any right you otherwise might have to seek or accept any damages or release in any proceeding. Furthermore, to the extent that you file any claim against Freddie Mac or any claim is filed on your behalf against Freddie Mac, you agree not to seek or accept any damages or other relief as a result of such claims.

*See* George Dec at ¶ 7.

Freddie Mac's "Non Participation" clause seeks to thwart, hinder, and obstruct otherwise lawful communication about non trade secret, non privileged facts and thus, is unenforceable, void against public policy, and contrary to the intent of the PSLRA. *See, e.g., In re JDS Uniphase Corp.*

13

*Sec. Litig.*, 238 F. Supp. 2d 1127, 1134 (N.D. Cal. 2002) ("'[N]either logic, tradition, the constitution nor the PSLRA prohibit interviewing prospective witnesses' . . . . In fact, the Reform Act's heightened pleading standard encourages plaintiffs to do *more* investigation before filing a complaint, not less."); *In re Flir Sys. Inc. Sec. Litig.*, No. 00-360-HA, 2000 WL 33201904, at *3 (D. Or. Dec. 13, 2000) ("[t]he PSLRA is a shield intended to protect security-fraud defendants from costly discovery requirements, not to be a sword with which defendants can destroy the plaintiffs' ability to obtain information from third parties who are otherwise willing to disclose it."); *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 445-46 (S.D.N.Y. 1995) ("[A]greements calling or appearing to call for silence concerning matters relevant to alleged legal violations, whether or not such agreements are sought to be enforced, inherently chill communication relevant to the litigation.").

The agreements at issue in these cases are strikingly similar to those used by Freddie Mac. In *In re JDS Uniphase*, the lead plaintiff in a securities fraud class action moved for an order limiting the scope of confidentiality agreements signed by former employees. *In re JDS Uniphase*, 238 F. Supp. 2d at 1127. The court reasoned that the then-recently enacted Sarbanes-Oxley Act of 2002 "demonstrates the *public policy in favor of allowing even current employees to assist in securities fraud investigations. It certainly does not establish a public policy in favor of allowing employers to muzzle their employees with overbroad confidentiality agreements.*" *Id.* at 1136. Thus, the court held that confidentiality agreements binding former employees did not preclude former employees from disclosing non trade secret information regarding securities fraud. *Id.* at 1137-38.

Similarly, in *In re Flir Systems*, plaintiffs had indentified a former employee of defendants who had information that the defendants willfully engaged in accounting irregularities. *In re Flir Sys.*, 2000 WL 33201904, at *1. Defendants threatened the former employee with legal action if he cooperated with the plaintiffs' counsel. *Id.* The court concluded that plaintiffs were unduly

14

prejudiced by defendants' attempts to obstruct the discovery of information relevant to plaintiffs' case from the former employee. *Id.* at *3.

Further, in *Chambers*, the plaintiff's counsel sought information from former employees who signed severance agreements with the defendant. *Chambers*, 159 F.R.D. at 442. Defendants argued that former employees were prohibited from divulging information to plaintiff's counsel under the confidentiality provision of the severance agreements. *Id.* In reasoning that this sort of restriction is contrary to public policy, this Court noted that "agreements restricting former employee revelation of events in the workplace which are not privileged but may involve violations of federal law have the effect of hindering implementation of the Congressionally mandated duty to enforce the provisions of the federal statutes." *Chambers*, 159 F.R.D. at 445. Thus, the Court ordered the defendant to either: (1) notify all former employees whom plaintiff wanted to interview, in writing, that no unfavorable consequences would flow from providing information to plaintiffs' counsel concerning specific subjects; or (2) accept an adverse inference that the information, if disclosed, would be contrary to defendants' position. *Id.*

As a result of the unenforceable "Non Participation" clause, many former employees, who are otherwise willing to offer information regarding their employment with Freddie Mac, are refusing to speak with Lead Plaintiff's counsel and investigators. Freddie Mac's attempt to obstruct any factual investigation of its wrongdoing has severely prejudiced shareholders by preventing them from obtaining any access to information from these former employees. The undue prejudice already suffered by Lead Plaintiff can be rectified by partially lifting the PSLRA discovery stay to allow production of the Committee Investigation Documents.

Freddie Mac has repeatedly represented to investors that it acted with complete transparency in its purchase of risky mortgages. Notwithstanding these representations, Freddie Mac already has

produced documents and other information to the government investigators demonstrating that its Class Period statements were false and misleading. If the stay remains in place, Lead Plaintiff will be without access to this already-produced information and will be unduly prejudiced by its inability to make informed decisions about its litigation strategy in this rapidly shifting landscape.

Moreover, the basis for partially modifying the stay in this case is particularly compelling because the documents produced for the investigative hearing on "The Role of Fannie Mae and Freddie Mac in the Financial Crisis" go far beyond typical fact discovery. Rather than being simply relevant or merely reasonably calculated to lead to the discovery of admissible evidence, the Committee Investigation Documents are direct scienter and falsity facts corroborating Lead Plaintiff's claims, and offer further support that the pleading requirements of the PSLRA have been satisfied. Thus, the automatic stay should be modified to the extent necessary to place Lead Plaintiff on a level playing field, so as to prevent the type of "undue prejudice" that the PSLRA specifically gave this Court the discretion to prevent.

**E.    Modification of the PSLRA Discovery Stay Will Not Impose an Undue Burden on Defendants**

"[I]t is customary to consider whether a production request places an undue burden on the party from which it is requested." *In re WorldCom*, 234 F. Supp. 2d at 306. Here, Lead Plaintiff seeks nothing more than access to the very same information that has already been produced to the government investigators. Accordingly, as the costs and expenses associated with such a production of this closed universe of documents have already been incurred and absorbed by Defendants, complying with this request will place only the slightest additional burden upon Defendants. *See, e.g., Waldman v. Wachovia Corp.*, No. 08 Civ. 2913 (SAS), 2009 WL 86763, at *2 (S.D.N.Y. Jan. 12, 2009) (concluding that the burden is slight when defendants have "already found, reviewed, and organized the documents.").

In *Waldman*, this Court reasoned that the unavailability of the requested documents placed a burden on the plaintiffs' ability to determine whether to continue with the case. *Id.*, at *2. In balancing the burden on the defendants compared to the potential prejudice to plaintiffs, this Court determined that the balance favored the plaintiffs based on lack of cost to defendants to produce the documents. *Id.*

Likewise, in the *FirstEnergy* securities litigation, the court noted that the defendants could not allege any burden from producing the requested information because the defendants already reviewed, compiled and produced the requested information to the government. *FirstEnergy*, 229 F.R.D. at 545. The court further noted that there was no risk that plaintiffs were using discovery as a fishing expedition because, as here, the complaint alleged facts to independently support the claims. *Id.*

Similarly, in *Singer,* the court noted that "since these documents have already been found and compiled and plaintiffs will pay production costs, defendants will not be unduly burdened by producing them to plaintiffs now." *Singer*, 2003 U.S. Dist. LEXIS 26189, at *2. As in *Singer*, Lead Plaintiff here is willing to pay the reasonable production costs for the closed universe of materials already produced to the House Committee.[7]

Likewise, in *WorldCom*, the court found that "[n]either rationale underlying the PSLRA's discovery stay provision [was] contravened by plaintiffs' application," because the plaintiffs "clearly [had] not filed the complaint to initiate a 'fishing expedition' in search of sustainable claims or to force defendants to settle an otherwise frivolous class action." *WorldCom*, 234 F. Supp. 2d at 305. Therefore, the court concluded:

---

[7] To the extent electronic copies of the documents are available, Lead Plaintiff would prefer production of the documents electronically to minimize court costs to all parties.

> Where, as here, plaintiffs are not in any sense engaged in a fishing expedition or an
> abusive strike suit and do not thereby act in contravention of the fundamental
> rationales underlying the PSLRA discovery stay . . . defendants cannot call upon the
> ambiguous notion of "particularized" discovery to bend Section 78u-4(b)(3)(B) to a
> purpose for which it was not intended.

*Id.* at 306.

In *Enron*, the court granted a similar request to modify the automatic stay of discovery,

permitting the plaintiffs to obtain discovery from Enron of certain documents that had already been,

or would be, made available to and reviewed by the government and others. The court explained

that the PSLRA's discovery stay "'was designed to prevent fishing expeditions in frivolous securities

lawsuits' and 'was not designed to keep secret from counsel in securities cases documents that have

already become available for review by means other than discovery in the securities case.'" *Enron*,

2002 U.S. Dist. LEXIS 26261, at *30.

The *Enron* Court again modified the discovery stay several months later to permit the

plaintiffs in the securities fraud action to receive additional documents that *Enron* had produced in

response to inquiries or investigations by Congress, legislative branch committees, and the executive

branch (including the SEC and the DOJ), as well as transcripts of witness interviews and depositions

related to those inquiries. *See id.*, at *29-*32. The court rejected the defendants' argument that the

PSLRA prohibited such discovery, and directed the materials be produced to the lead plaintiff

because "[i]n a sense this discovery has already been made, and it is merely a question of keeping it

from a party because of the strictures of a statute designed to prevent discovery abuse." *Id.* at *32.

The court found the PSLRA discovery stay was designed to protect defendants from unnecessary

discovery costs, but the burden was slight because *Enron* had already found, reviewed, and

organized the documents. *Id.*

In ordering the production of SEC and New York Stock Exchange documents, this Court in

*LaBranche* stated that when it is clear that plaintiffs are not seeking to use the discovery in order to

"force a coercive settlement or to find a claim not alleged in the complaint," then access to these type of documents "is essential to determine that [litigation] strategy and to assist in formulating an appropriate settlement demand." *In re LaBranche*, 333 F. Supp. 2d at 183-84. This Court added that "Lead Plaintiffs will suffer undue prejudice in having to defer such decisions. The Defendants have not demonstrated any burden imposed by complying now with the inevitable discovery." *Id.* at 184.

Here, as in each of the cases discussed above, Lead Plaintiff seeks to obtain information already collected and provided to other parties. In particular, Lead Plaintiff only seeks the following documents:

1.      All documents produced to the U.S. House Committee in connection with the investigative hearing on "The Role of Fannie Mae and Freddie Mac in the Financial Crisis," together with transcripts of any interviews conducted by the Committee in the course of such investigation.

2.      All documents produced to the United States Attorney's Office for the Southern District of New York in connection with its current investigation of Freddie Mac, including but not limited to the documents responsive to the federal grand jury subpoena received by Freddie Mac on September 26, 2008, and transcripts of any interviews in connection therewith.

3.      All documents produced to the United States Attorney's Office for the Eastern District of Virginia in connection with its current investigation of Freddie Mac, and transcripts of any interviews in connection therewith.

4.      All documents produced to the SEC in connection with its current investigation of Freddie Mac, and transcripts of any interviews in connection therewith.

This is an even narrower category of documents than the court permitted the securities litigation plaintiffs in *Enron* to have on the ground that "discovery already has been made." Similarly, here, modifying the automatic stay to permit this discovery would not impose any burden (let alone an undue burden) on Defendants because the information already has been collected for the purposes of responding to the government investigations and Lead Plaintiff has offered to pay the reasonable costs of copying the documents.

Moreover, Defendants cannot make a good faith argument that this is a strike suit aimed at coercing a settlement. Nor can Lead Plaintiff's request be reasonably characterized as a "fishing expedition" to find evidence in support of claims not yet alleged. Accordingly, Lead Plaintiff requests that the Court modify the discovery stay and allow Lead Plaintiff access to the requested documents and information.

## IV.    CONCLUSION

Based on the foregoing reasons, Lead Plaintiff's Motion to Partially Modify the PSLRA Discovery Stay should be granted in its entirety.

**WHEREFORE**, Lead Plaintiff respectfully requests that the Court enter an Order granting Lead Plaintiff's Motion to Partially Modify the PSLRA Discovery Stay, and such other and further relief as the Court deems just and proper.

DATED:  April 17, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PAUL J. GELLER
DAVID J. GEORGE
ROBERT J. ROBBINS
JAMES L. DAVIDSON


                    *David J George*

DAVID J. GEORGE
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@csgrr.com
dgeorge@csgrr.com
rrobbins@csgrr.com
jdavidson@csgrr.com

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@csgrr.com

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
RAMZI ABADOU
ERIK D. PETERSON
DARRYL J. ALVARADO
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
rabadou@csgrr.com
epeterson@csgrr.com
dalvarado@csgrr.com

Lead Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by e-mail and

Federal Express to the following persons on April 17, 2009:


H. Peter Haveles, Jr., Esq.
ARNOLD & PORTER, LLP
P.O. Box 3086
New York, NY 10022
Tel: (212) 715-1000
Fax: (212) 715-1399

*Attorneys for Federal Housing Finance Agency*

Russell Lawrence Lippman
ROPES & GRAY, LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9042
Fax: (646) 728-2947

*Attorneys for Richard Syron, Patricia L. Cook, and Anthony S. Piszel*

Jordan D. Hershman, Esq.
BINGHAM MCCUTCHEN, LLP
One Federal Street
Boston, MA 02110
Tel: (617) 951-8455
Fax: (617) 951-8736

*Attorneys for Federal Home Loan Mortgage Company*


David J. George

22