**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------X
JINO KURIAKOSE, Individually and    :
on Behalf of All Others Similarly   :
Situated,                           :
                                    :
                      Plaintiff,    :
                                    :
      -against-                     :
                                    :
FEDERAL HOME LOAN MORTGAGE CORP.,   :
RICHARD SYRON, PATRICIA L.          :
COOK, and ANTHONY S. PISZEL,        :
                                    :
                      Defendants.   :
------------------------------------X
```

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  March 30, 2011 |

08 Civ. 7281 (JFK)

**OPINION AND ORDER**

APPEARANCES

 For Lead Plaintiff Central States, Southeast and Southwest
 Areas Pension Fund:

  ROBBINS GELLER RUDMAN & DOWD LLP
  By: Paul J. Geller, Esq.
    David J. George, Esq.
    Robert T. Robbins, Esq.
    James L. Davidson, Esq.
    Samuel H. Rudman, Esq.
    Darryl J. Alvarado, Esq.

 For Plaintiff National Elevator Industry Pension Plan:

  O'DONOGHUE & O'DONOGHUE LLP
  By: Louis P. Malone, III, Esq.

 For Defendants Federal Home Loan Mortgage Corporation:

  BINGHAM MCCUTCHEN LLP
  By: Jordan D. Hershman, Esq.
    Jason D. Frank, Esq.
    Kenneth I. Schacter, Esq.

  FEDERAL HOME LOAN MORTGAGE CORPORATION
  By: Hyacinth Kucik, Esq.
    Lance J. Wolf, Esq.
    Howard Lindenberg, Esq.

For Defendants Richard Syron, Patricia L. Cook, and Anthony
S. Piszel:

    ROPES & GRAY LLP
    By:  Russell L. Lippman, Esq.
        Randall W. Bodner, Esq.
        Christoperh G. Green, Esq.
        C. Thomas Brown, Esq.

**JOHN F. KEENAN, United States District Judge:**

Lead Plaintiff Central States, Southeast and Southwest

Areas Pension Fund and plaintiff National Elevator Industry

Pension Plan (collectively, "Plaintiffs") bring this putative

securities fraud class action suit against the Federal Home Loan

Mortgage Corporation ("Freddie Mac"), former Freddie Mac Chief

Executive Officer Richard Syron ("Syron'"), former Freddie Mac

Chief Financial Officer Anthony Piszel ("Piszel"), and former

Chief Business Officer Patricia Cook ("Cook") (collectively,

"Individual Defendants").  Plaintiffs allege that Freddie Mac

and the Individual Defendants violated Section 10(b) of the

Securities Exchange Act of 1934 ("'34 Act"), 15 U.S.C. § 78j(b),

and Securities and Exchange Commission Rule 10b-5, 17 C.F.R.

§ 240.10b-5.  Furthermore, Plaintiffs allege that the Individual

Defendants are "controlling person[s]" liable under Section

20(a) of the '34 Act, 15 U.S.C. § 78t, for Freddie Mac's alleged

violations of the '34 Act and Rule 10b-5 during the Class

Period.

Plaintiffs' represent a putative class "consisting of all those who purchased Freddie Mac equity securities"[1] from November 20, 2007, through September 7, 2008 ("the Class Period"). (Am. Compl. ¶ 29). Plaintiffs claim that following Freddie Mac's disclosure of a $2 billion loss for the third quarter of 2007 on November 20, 2007, (Am. Compl. ¶ 4), Freddie Mac and the Individual Defendants materially misrepresented Freddie Mac's exposure to risky mortgage products, the sufficiency of its capital, and the accuracy of its financial reporting, (Am. Compl. ¶¶ 134-220, 221-258, 259-288). According to Plaintiffs, these misrepresentations resulted in inflated share prices of its common and preferred shares, which declined as "the truth regarding Freddie Mac's true financial circumstances leaked out through a series of partial disclosures, and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market . . . ." (Am. Compl. ¶ 572).

Before the Court are Freddie Mac's and the Individual Defendants' motions to dismiss with prejudice the Amended Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and under Sections101(b) and 102(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4(b), 78u-5(c). For the reasons stated below, the

---

[1] According to the Amended Complaint, Freddie Mac issues common stock and twenty series of preferred stock. (Am. Compl. ¶ 30).

Amended Complaint fails adequately to plead '34 Act and Rule 10b-5 claims against Freddie Mac and the Individual Defendants, and accordingly, Freddie Mac's and the Individual Defendants' motions to dismiss are granted.  However, because Rule 15 of the Federal Rules of Civil Procedure requires this Court to freely grant leave to amend the pleadings when justice so requires, the Court dismisses the Amended Complaint without prejudice.

## I.  Background

The following facts are taken from the Amended Complaint and are assumed to be true for purposes of this motion to dismiss.

## A.  The Parties

Lead Plaintiff Central States Southeast and Southwest Area Pension Fund is a Taft-Hartley pension fund that had 10,000 active participants and more than $26 billion in assets as of yearend 2007. (Am. Compl. ¶ 20.)  Central States purchased 932,709 shares of Freddie Mac common stock during the Class Period. (Am. Compl. ¶ 20).  Plaintiff National Elevator Industry Pension Plan is a pension fund with over 40,000 participants and $4 billion in assets.  National Elevator purchased 361,876 shares of Freddie Mac common stock and 120,600 shares of Freddie Mac preferred stock during the Class Period. (Am. Compl. ¶ 21).

Freddie Mac is a government-sponsored enterprise ("GSE") with its principal place of business located in McLean,

Virginia. (Am. Compl. ¶ 22).  It was chartered by Congress in 1970 to provide stability in the secondary market for residential mortgages, to increase the liquidity of mortgage investments, and to improve the distribution of investment capital available for residential mortgage financing. (Am. Compl. ¶ 64).  Until the passage of the Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (July 30, 2008), Freddie Mac was regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO").  Pursuant to the Housing and Economic Recovery Act of 2008, the newly created Federal Housing Finance Agency ("FHFA") replaced OFHEO as Freddie Mac's regulator. See §§ 1101-02, 122 Stat. at 2661-64.  On September 7, 2008, after Freddie Mac suffered losses due to a nation-wide decline in housing prices, the U.S. Government placed Freddie Mac in the hands of a conservator "to temporarily run Freddie Mac until [it] is on stronger footing." (Am. Compl. ¶ 299).

The Individual Defendants were employed by Freddie Mac as executives during the Class Period.  Syron served as the Chairman of the Board and CEO of Freddie Mac from December 2003 to October 2008, and was relieved of his duties after the company entered conservatorship. (Am. Compl. ¶ 23).  Piszel served as Freddie Mac's Executive Vice President and CFO from November 13, 2006, until September 22, 2008. (Am. Compl. ¶ 24). In their respective capacities as CEO and CFO of Freddie Mac,

Syron and Piszel certified the accuracy of Freddie Mac's
financial statements, and this certification required Syron and
Piszel to represent that Freddie Mac's financial statements
contained no untrue statements of material fact and contained
all material financial information. (Am. Compl. ¶ 25).  Cook
began working for Freddie Mac on August 2, 2004.  She served as
Freddie Mac's Executive Vice President for Investments and
Capital Markets and Chief Business Officer from June 2007 to
November 17, 2008. (Am. Compl. ¶ 26).

**B.  The Secondary Mortgage Market and Freddie Mac's Business**

Together with the Federal National Mortgage Association,
another GSE commonly referred to as "Fannie Mae," Freddie Mac
has "an affirmative obligation to facilitate the financing of
affordable housing for low- and moderate-income families in a
manner consistent with their overall public purposes, while
maintaining a strong financial condition and a reasonable
economic return . . . ." 12 U.S.C. § 4501(7).

Within the United States housing market, borrowers are
classified using various terms based on their perceived credit
risk. (Am. Compl. ¶ 152).  A potential mortgage borrowers' risk
of default typically is assessed by his or her Fair Isaac Credit
Organization ("FICO") score, a numerical grade calculated by
credit rating companies based on the borrower's credit history.
(Am. Compl. ¶ 154).  The median United States FICO score is

roughly 720. (Am. Compl. ¶ 154 n.18).  Borrowers with high FICO scores--those that carry the lowest risk of default--are often classified as "prime," "A paper," "conforming," or "investment grade."  These terms are generally synonymous and historically used to describe quality loans purchased by Freddie Mac and Fannie Mae.  Loans to borrowers with credit characteristics lower than "prime" are generally classified as either "subprime" or "Alt-A."  It is generally accepted that "subprime" refers to a borrower with a FICO score lower than 660.  (Id. ¶ 152.)  The term "Alt-A" is shorthand for "Alternative to Agency," which historically means loans not meeting the published standards of Freddie Mac or Fannie Mae. (Am. Compl. ¶ 342).

To fulfill its role as a facilitator of affordable housing, Freddie Mac purchases mortgages and residential mortgage backed securities ("RMBS") and issues RMBS.  RMBS are typically created by a sponsor, who pools large amounts of residential mortgages in a special purpose entity ("SPE"), which in turn issues bonds collateralized by the underlying real estate of the mortgage pool. (Am. Compl. ¶¶ 345-46).  An SPE may issue different classes, or "tranches," of a given RMBS, with each tranche representing a different level of investment risk.  The most senior tranche receives first priority on cash flows from the underlying mortgages, but is paid the lowest amount of interest.  Conversely, the most junior tranche has the lowest priority on

cash flows from the underlying mortgages but receives a higher interest payment so long as the underlying mortgages are not in default. (Am. Compl. ¶ 347).  A variant on RMBS, a collateralized debt obligation ("CDO"), is created by pooling RMBS or other asset-backed securities instead of mortgages.  As with RMBS bonds, CDO bonds are issued in tranches, with more senior tranches receiving a lower risk and lower potential return on investment and more junior tranches receiving a higher potential return on investment with higher risk. (Am. Compl. 349-50).

Freddie Mac purchases mortgage loans and RMBS for investment purposes through its "retained portfolio" line of business ("Retained Portfolio"), and it sponsors RMBS through its "mortgage securitization/credit guarantee" line of business ("Guarantee Portfolio").  Unlike some other RMBS sponsors, Freddie Mac guarantees the timely repayment of principal and interest to the bond holder, thereby assuming the credit risk of the RMBS bonds.  In order to manage the credit risk it assumes, Freddie Mac imposes certain standards and responsibilities upon parties originating the mortgages underlying the RMBS it issues. (Am. Compl. ¶ 68).  Freddie Mac derives revenue from its Guarantee Portfolio by charging a management fee for acting as a sponsor of RMBS and a guarantee fee for assuming the credit risk in the transaction. (Am. Compl. ¶ 69).

C.   **The Financial Crisis**

Low interest rates and large inflows of foreign capital led to easy credit conditions in the first decade of the 21st century.  These easy credit conditions encouraged Americans to purchase homes at increasing rates, and the U.S. home ownership rate hit an all-time high of 69.2% in 2004. (Am. Compl. ¶ 72, ¶ 72 n.8).  Mortgage lenders were able to accumulate and direct sufficient capital to meet the high demand for residential mortgages using complex financial products such as RMBS and CDOs. (Am. Compl. ¶ 76).  Because ratings agencies and investors believed that the structure of the financial products would protect holders of the senior tranches of the securities, the senior tranches were sometimes given AAA ratings, regardless of the quality of individual loans underlying the financial products. (Am. Compl. ¶ 76).  Mortgage originators were able to sell mortgages for securitization purposes and retain a commission without retaining credit risk, and investors and financial institutions purchased the RMBS and CDOs because of their high credit ratings and high potential for return on investment relative to comparably rated securities.  With mortgage lenders eager to lend and investors willing to buy, sponsors of RMBS and CDOs were incentivized to reduce underwriting standards and began to relax documentation requirements. (Am. Compl. ¶ 75).

The housing market shifted radically in 2006, when housing prices began to fall and interest rates began to rise; this combination dramatically reduced many homeowners' equity and simultaneously increased the interest payments owed by homeowners with variable-rate mortgages.  Increases in defaults had a cascading effect on credit markets due to the correlation between rising rates of default, the falling values of the encumbered houses, and the decline of the value of securities backed by those mortgages. (Am. Compl. ¶ 74).

This shift in the housing market caused Freddie Mac to report a loss of more than $2 billion on November 20, 2007, causing its stock price to fall from $37.50 at the close of trading on November 19 to $26.74 at the close of trading on November 20. (Am. Compl. ¶ 4).  Over the next ten months, Freddie Mac's financial condition continued to worsen, and on September 7, 2008, Freddie Mac entered into conservatorship.

**D.    Class Period Allegations of Fraud**

Plaintiffs claim that, in the wake of the November 20, 2007, disclosure of Freddie Mac's $2 billion loss, Freddie Mac and the Individual Defendants misrepresented the state of affairs at Freddie Mac, causing economic damage to holders of its equity securities until Freddie Mac was eventually placed into the hands of a conservator.  Plaintiffs claim that during the Class Period, Freddie Mac and the Individual Defendants

misrepresented three categories of information about Freddie
Mac:  (1) its exposure to "non-prime mortgage loans"; (2) its
"capital adequacy"; and (3) the strength of its due diligence
and quality control mechanisms. (Pls.' Mem. Opp. 2-3).  The
alleged misrepresentations are detailed in the Amended
Complaint, paragraphs 444 through 521, and generally occur in
connection with the release of financial reports that were
released on November 20, 2007, February 28, 2008, and May 13,
2008.  Other alleged misstatements took place during investor
and analyst conference calls and press releases, at the Eleventh
Annual Lehman Brothers Financial Services Conference held on May
20, 2008, and at the 2008 Annual Stockholder's Meeting on June
6, 2008.  A final group of misstatements were made after Freddie
Mac's alleged misrepresentations began to be revealed:  these
statements were made on July 10, 11, and 13, and August 4, 5,
and 6, 2008, and primarily concerned Freddie Mac's capital
adequacy and the strength of its internal controls and risk
management. (Am. Comp. ¶ 526).

Plaintiffs present the allegedly false statements in bold-
face and italicized type. (See Am. Compl. at 168).  Many of the
allegedly false statements were made at various points
throughout the Class Period and, for the sake of brevity, the
Court will not repeat every such statement herein. (Compare Am.
Compl. ¶ 441 (stating on November 20, 2007, that Freddie Mac had

"taken important steps to address the impact of the declining
housing and credit markets to [its] business") <u>with</u> Am. Compl.
¶ 480 (stating on February 28, 2008, that Freddie Mac had "taken
a number of important steps to relieve some of the pressure in
'08").

At several points during the Class Period, Freddie Mac
claimed to be handling its finances in light of the housing
crisis "in a prudent and responsible way," (<u>see</u> Am. Compl. ¶ 481
(Syron on February 28, 2008), ¶ 489 (Syron on March 12, 2008)),
or used similar language, (<u>see</u> Am. Compl. ¶ 504 ("We continued
to make prudent provision for credit losses, monitor our credit
book closely and maintain our disciplined approach to managing
interest-rate and other risks.") (Piszel on May 14, 2008)).  A
statement made by Syron on December 11, 2007, is typical of many
of the allegations that relate to Freddie Mac's alleged non-
disclosure of its involvement in non-conforming mortgages:

> Finally, we feel that our credit position in the
> current guarantee book, actually, is very near the
> best of the entire industry. A very major reason for
> this is that we have very low exposures to Alt-A in
> risk-layered mortgage products in the guarantee
> business. We didn't do any subprime business. And, if
> you look at layered products and Alt-A, they together
> amount to about 9% of our total guarantee portfolio.

(Am. Compl. ¶ 460).  Plaintiffs also allege that Syron misled
the investing public when he stated that, "[u]nlike banks and
brokerages, Freddie [Mac] is chartered to focus solely on the

$9.4 trillion conventional/conforming residential mortgage market." (Am. Comp. ¶ 459).  The financial reports released during the Class Period all contained representations about Freddie Mac's sub-prime mortgage loan holdings in its Retained and Guarantee Portfolios, disclosed the criteria used to classify mortgage loans as "Alt-A" and "subprime," and discussed Freddie Mac's attempt to "manage the underlying risk [of default] by adequately pricing for the risk [it] assume[d] using [its] underwriting and quality control processes. (See, e.g., Am. Compl. ¶ 477).

From the very beginning of and throughout the Class Period, Freddie Mac and the Individual Defendants made a number of statements reassuring investors that it was "optimistic" about its "longer-term prospects." (Am. Compl. ¶ 441).  Such statements implicitly communicated that Freddie Mac had a sufficient capital "cushion" to continue to operate in the long-term, but Freddie Mac and the Individual Defendants also made a number of more specific statements about the Freddie Mac's capital adequacy.  For example, in its February 2008 Financial Report, Freddie Mac stated that it was able "to prudently manage" its capital and reported that it had capital exceeding the company's regulatory minimum capital requirement as well as the 30% mandatory target capital surplus directed by OFHEO. (Am. Compl. ¶ 472).  The February 2008 Financial Report also

contained a "Capital Adequacy" section, which warned of several
factors that could adversely affect the adequacy of Freddie
Mac's capital, including:  "GAAP net losses; continued declines
in home prices; changes in our credit and interest-rate risk
profiles; adverse changes in interest-rate or implied
volatility; adverse OAS changes; legislative or regulatory
actions that increase capital requirements; or changes in
accounting practices or standards." (Am. Compl. ¶ 475).
Plaintiffs allege that Freddie Mac employed a variety of
accounting "tricks" and thereby overstated its core capital.
Specifically, Freddie Mac is alleged to have inflated its
apparent capital by overstating the value of deferred tax
assets, (Am. Compl. 435-36), and improperly refusing to take an
"other-than-temporary" impairment of certain RMBS it held, (Am.
Compl. ¶ 499).

        Finally, Plaintiffs allege that a number of statements made
during the Class Period by Freddie Mac and the Individual
Defendants misled investors about Freddie Mac's underwriting,
due diligence, and quality control systems.  A typical example
is a statement by Piszel in Freddie Mac's November 2007 Press
Release; Piszel reported that Freddie Mac had "taken important
steps to address the impact of declining housing and credit
markets" by "raising prices, tighten[ing its] credit standards
and enhanc[ing its] risk management practices." (Am. Compl. ¶

441).  Later, in the press release that accompanied the May 2008
Financial Report, Piszel stated that Freddie Mac "continued to
make prudent provision for credit losses, monitor [its] credit
book closely and maintain [its] disciplined approach to managing
interest-rate and other risks." (Am. Compl. 504.)  On a
conference call with investors and analysts following the
release of the May 2008 Financial Report, Syron stated that
Freddie Mac had "improved [its] underwriting standards by
insisting on better quality for new guarantees and reducing
[its] volumes of riskier loan products." (Am. Compl. ¶ 507).

**E.   Confidential Witnesses**

To support their claims that Freddie Mac and the Individual
Defendants violated Section 10(b) of the '34 Act and SEC Rule
10b-5, Plaintiffs present statements from twenty-seven
confidential witnesses in the Amended Complaint.  These
confidential witnesses consist of former employees of Freddie
Mac, former consultants who worked for Freddie Mac, and one
former employee of OFHEO. (See Am. Compl. ¶¶ 36-62).  Each is
identified by their job title and by the time periods during
which they were employed by or consulted for Freddie Mac.  The
confidential witnesses provide background information on Freddie
Mac's internal corporate structure and often state--at times
employing "colorful" language--differences of opinion with
Freddie Mac's management, but their testimony is directly

relevant on this motion to dismiss only with respect to:
(1) the question of whether Freddie Mac and the Individual
Defendants acted with scienter; and (2) the accuracy of Freddie
Mac's public statements regarding its underwriting and quality
controls.

### 1. Confidential Witnesses Discussing Individual Defendants' Alleged States of Mind

Plaintiffs allege that various statements by confidential
witnesses confirm that Syron, Piszel, and Cook acted with
scienter.  These statements come from a Vice President of
Investor Relations at Freddie Mac, (see Am. Compl. ¶¶ 36, 66-67,
70, 90, 96, 98, 99, 100, 101, 117-18, 149, 150, 174, 197-98,
211, 240), a Director of Operational Risk Management, (see Am.
Compl. ¶¶ 37, 89, 222, 223-28, 231-34), a Senior Servicing
Default Specialist, (see Am. Compl. ¶¶ 41, 249), a Director of
Enterprise Risk Management, (see Am. Compl. ¶ 52), a Financial
Analysis Director Transaction Reporting Director in the Retained
Portfolio Group, (see Am. Compl. ¶ 55), a Project Management
Organization Senior Business Analyst, (see Am. Compl. ¶¶ 60,
104), a Senior Director of New Product Development, (see Am.
Compl. ¶¶ 61, 107, 115, 179-80), and a Product Controller for
the Retained Portfolio, (see Am. Compl. ¶¶ 62, 275-88, ¶ 285
n.29).

These confidential witnesses suggest that Syron, Piszel, and Cook were made aware of problems faced by Freddie Mac during the Class Period by reports sent up through the chain of command. (See, e.g., Am. Compl. ¶¶ 36, 37).  They discuss the mid-2004 termination of David Andrukonis, Freddie Mac's Chief Risk Officer, after disagreements between Andrukonis and other executives at Freddie Mac about its exposure to risks posed by non-conforming loans. (Am. Compl. ¶¶ 88-89, 232).  One confidential witness alleges that Freddie Mac loosened its underwriting standards in an attempt to increase its market share. (Am. Compl. ¶¶ 107, 115).  Another confidential witness describes his attempts to quantify the risks Freddie Mac was facing in early 2008 by performing a Value at Risk ("VAR") calculation; this witness alleges that Freddie Mac executives were unwilling to consider VAR as a risk measurement, despite its use by other prominent investment banks. (Am. Compl. ¶ 283-85).

### 2.  Confidential Witnesses Discussing Freddie Mac's Internal Controls and Financial Reporting

Plaintiffs present allegations made by a number of confidential witnesses regarding the adequacy of Freddie Mac's internal controls and accuracy of its financial reporting. These include statements from a Senior Program Director for Information Services, (see Am. Compl. ¶ 38), a Senior Examiner

of Credit Risk for OFHEO, (see Am. Compl. ¶¶ 39, 293-97), a
Senior Business Application Project Manager, (see Am. Compl.
¶¶ 42, 116, 182, 185-187), a Senior Business Analyst/Project
Manager in the Illinois Technology Office, (see Am. Compl.
¶¶ 43, 184), a Senior Risk Analyst (see Am. Compl. ¶¶ 45, 255-
257), a Senior Transaction Manager, (see Am. Compl. ¶¶ 48, 108-
14, 121-22, 201, 207-208, 216), a Business Analyst Consultant
for Actualized Consulting, (see Am. Compl. ¶¶ 50, 258), a Senior
Quality Control Specialist for Clayton Group, (see Am. Compl.
¶¶ 51, 205-206), a Servicing Manager for Non-Performing Loans,
(Am. Compl. ¶¶ 53, 145-46, 181, 210, 248), a Senior Loan
Analyst, (see Am. Compl. ¶¶ 56, 119-20, 147-48, 188-90, 193,
217-18), an Operational Risk Manager, (see Am. Compl. ¶¶ 57,
178, 214-15), a Financial Services Consultant for Primatics
Financial (see Am. Compl. ¶¶ 58, 103, 237-39), an Operational
Risk Manager, (see Am. Compl. ¶ 57, 178, 214-15), and Financial
Analysts in the Single Family Transaction Accounting Department
(see Am. Compl. ¶¶ 44, 105, 250-51), the Financial Reporting and
Analysis Group, (see Am. Compl. ¶¶ 47, 263, 265-274,) the Single
Family Operations Group, (see Am. Compl. ¶¶ 49, 243), and the
Multi-Family Affordable Housing Group, (see Am. Compl. ¶¶ 59,
195-96, 259-62).

These confidential witnesses discuss certain limitations of
Freddie Mac's "Loan Prospector" software and Freddie Mac's

attempts to automate the assessment of credit risks of purchased or pooled non-conforming mortgages.  Freddie Mac formerly reviewed non-conforming loans by employing sampling methods and relying in part on the analysis of outside consultants' and mortgage originators' computer systems. (See Am. Compl. ¶¶ 215, 217.)  Several of the confidential witnesses describe being pressured to process loans quickly, at the expense of accurate inquiry into the quality of the loans being acquired. (See, e.g., Am. Compl. ¶¶ 190, 217-18).  Additionally, the Operations Risk Manager reported that fraud detection at Freddie Mac was inadequate and that OFHEO had urged Freddie Mac to implement "data mining" in order to detect fraud on a larger scale, rather than the manual fraud-detection process in use at the time. (Am. Compl. ¶¶ 214-15).

## II.  Discussion

### A.  Pleading Standards and Elements of a § 10(b) Claim

A defendant may move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss any complaint that "fail[s] to state a claim upon which relief can be granted."  In the absence of heightened or particularized pleading requirements, a complaint "states a claim for relief" when it contains "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand

for the relief sought." Fed. R. Civ. P. 8(a).  In making a determination as to whether the factual allegations support the pleader's claim to relief, the court must "accept[ ] as true all facts alleged in the complaint," and draw[ ] all inferences in favor of the plaintiff." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 692 (2d Cir. 2009) (quoting Faulkner v. Beer, 463 F.3d 130, 133 (2d Cir. 2006)).  However, a court need not accept mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. ----, 129 S. Ct. 1937, 1949 (2009). Therefore, even when Rule 8 governs the appropriate pleadings standard, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950.

Two sources of heightened pleading requirements are Federal Rule of Civil Procedure 9(b) and the PSLRA.

Rule 9(b) permits a plaintiff "alleging fraud or mistake" to allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally" but requires that the plaintiff "state with particularity the circumstances constituting fraud or mistake."  Intended to "provide a defendant with fair notice of a plaintiff's claim," Rule 9(b) requires that a plaintiff: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).  Though knowledge may be alleged generally, the Second Circuit has recognized that Rule 9(b) requires a plaintiff to "plead the events which they claim give rise to an inference of knowledge." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009) (quoting Devaney v. Chester, 813 F.2d 566, 568 (2d Cir. 1987)).

Section 101(b) of the PSLRA requires that a complaint alleging fraud under the federal securities laws "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(1)-(2).  Thus, the PSLRA "establishes a more stringent rule for inferences involving scienter because [it] requires particular allegations giving rise to a strong inference of scienter." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (emphasis added) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 194 (2d Cir. 2008)).

When deciding a Rule 12(b)(6) motion, "a district court may consider the [well-pleaded] facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  A district court may also consider any document "integral to the complaint" due to the complaint's reliance on that document's terms and effects, id., as well as "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  However, in considering a motion to dismiss pursuant to Rule 12(b)(6), a district court may not rely on a document when relevance or authenticity of that document is in dispute. DiFolco, 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 206)).

To state a claim under Section 10(b) of the '34 Act and Rule 10b-5 for fraudulent misrepresentation, a plaintiff must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Secs. Litig., 163, F.3d 102, 106 (2d Cir. 1998).  Failure to plead any of these required elements with the necessary level of specificity

is grounds for dismissal under Rule 12(b)(6).  Additionally, in order to plead proximate causation, a plaintiff must plead both "transaction" and "loss" causation.  Lentell, 396 F.3d at 172. Due to the "fraud-on-the-market" presumption of transaction causation in securities fraud cases where the security at issue was sold on an "impersonal, efficient market," see Basic v. Levinson, 485 U.S. 224, 248 (1988), transaction causation is not in dispute in this case.  However, to plead loss causation, one must sufficiently plead the existence of a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff," Lentell, 396 F.3d at 172 (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)), which is satisfied only where a plaintiff demonstrates that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor, Lentell, 396 F.3d at 173 (emphasis in original).

**B.   Freddie Mac's Motion to Dismiss**

    **1.   Exposure to the Subprime Market**

Plaintiffs seek to hold Freddie Mack liable under the federal securities laws for its attempts to misrepresent the quality of the mortgages it held in its Guarantee and Retained Portfolios and the extent of its involvement in the non-conforming mortgage market.  Freddie Mac argues that these

alleged misrepresentations cannot serve as a basis for a claim
of fraud under the federal securities laws because Freddie Mac
publicly disclosed its investment in non-conforming mortgages as
well as the risks associated with such investments, and
therefore encourages the Court to consider certain documents
that refute Plaintiffs' suggestion that it failed to disclose
its participation in the non-conforming mortgage markets.

Although in deciding a Rule 12(b)(6) motion, a district
court generally does not look beyond the complaint and draws
every reasonable inference in favor of the non-movant, in this
case, Defendants urge the Court to consider the November 2007
Financial Report in its entirety, in order to determine whether
Plaintiff's nondisclosure claims are properly pleaded under the
PSLRA.  The Amended Complaint alleges that Freddie Mac made
various misrepresentations in its November 2007 Financial
Report, which was released on the first day of the Class Period.
The November 2007 Financial Report is therefore "integral" to
the Amended Complaint, and the Court will consider the entire
document, and not just those portions quoted in the Amended
Complaint. See Tellabs, 551 at 322.

For a representation or omission of fact to constitute a
"material misrepresentation," the statement must relate to an
issue that would be pertinent to a reasonable investor's
decision to buy or sell a security, see Operating Local 649

-24-

Annuity Trust Fund v. Smith Barney Fund Mgmt., 595 F.3d 86, 91 (2d Cir. 2010) (District court may not hold alleged misstatements or omissions are immaterial "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (quotations omitted), and the statement must be false or misleading.  It is not sufficient for a plaintiff merely to allege that a statement is false or misleading; the PSLRA requires that a plaintiff explain "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  In this case, Plaintiffs assert that Freddie Mac misled investors on December 11, 2007, by stating publicly that it was chartered to focus solely on the $9.4 trillion conventional/conforming residential mortgage market" (Am. Comp. ¶ 459).  According to the Amended Complaint, this statement and other similar statements made during the Class Period misled investors and induced the media to report that Freddie Mac did not "touch subprime mortgages or many of the exotic types of loans that helped fuel the real estate bubble." (Am. Compl. ¶ 139).  The presence of media reports suggests at most that individuals may have been confused about the businesses in which Freddie Mac was involved; it does not inescapably follow that such confusion is reasonable.  The Amended Complaint does not explain why Freddie Mac's disclosures in its November 2007 Financial Report, such as

the statement that it had "increased [its] securitization volume of non-traditional mortgage products, such as interest-only loans as well as loans originated with lower documentation in the last two years in response to the prevalence of these products within the origination market," (Dfs.' App. Ex. 6 75-76), were insufficient to convey the truth that Freddie Mac was dealing in non-conforming mortgages to the public.  Indeed, Plaintiffs present no theory at all about why Freddie Mac's disclosures would not be understood by the reasonable investor and thus part of the "total mix" of information that determined its share price.  Plaintiffs' pleading that certain individuals were confused about Freddie Mac's public statements does not satisfy the PSLRA's requirement that plaintiffs explain why particular statements are misleading.  In this case, considering the November 2007 Financial Report as a whole, Plaintiffs have failed adequately to plead any reasons why Freddie Mac's disclosures that it did deal in non-conforming loans were insufficient, and therefore have failed to explain why the alleged misrepresentations were false.

Plaintiffs also argue that Freddie Mac used "non-standard" criteria to determine whether a loan was "subprime" and thereby concealed Freddie Mac's involvement in the non-conforming mortgage markets. (Am. Compl. ¶ 106).  Though Plaintiff alleges that it "is generally accepted by Federal regulators that a

borrower with a FICO score of less than 600 is considered subprime, (Am. Compl. ¶ 152), it is also clear from text quoted in the Amended Complaint that Freddie Mac disclosed the criteria it was using--a FICO score of 620--to define a "sub-prime" loan. (See, e.g., ¶ 447).  Plaintiffs do not explain why the disclosed use of a non-standard definition alone makes statements "false" or "misleading," and therefore its claims on this basis fail to satisfy the pleading requirements of the PSLRA.

For the reasons stated above, Plaintiffs' claims that Freddie Mac failed to disclose or misled investors about its involvement in the subprime lending market do not meet the level of specificity required by Section 101(b) of the PSLRA, 15 U.S.C. § 78u-4(b).

### 2.   Capital Adequacy

Plaintiffs also seek to hold Freddie Mac and the Individual Defendants liable for statements which allegedly misrepresented the amount of capital available to Freddie Mac during the Class Period.  Defendants seek dismissal of these claims on the grounds that none of the alleged misrepresentations are actionable as a matter of law and that Plaintiffs fail to plead their allegations that Freddie Mac deviated from generally accepted accounting principles ("GAAP").

To the extent that the Amended Complaint contains allegations that Freddie Mac materially misrepresented its

capital adequacy, Plaintiffs have failed to show that there was
a strong inference of scienter about these misrepresentations.
Statements of opinion or optimism "may be actionable upon a
showing that the defendants did not genuinely or reasonably
believe the position opinions they touted (i.e., the opinion was
without a basis in fact or the speakers were aware of facts
undermining the positive statements)." Lapin v. Goldman Sachs
Group, Inc., 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006).  The
statements made by Freddie Mac with respect to its capital
adequacy are forward-looking statements that must be shown to
have made without a basis in fact, as demonstrated by Piszel's
statement on November 20, 2007, conference call:

> Given the opportunities to deploy capital, and
> uncertainty of our GAAP results and credit conditions,
> as well as uncertainties on the relief of the 30%, we
> are planning on taking several actions to bolster our
> capital.  First, we have engaged Lehman Brothers and
> Goldman Sachs to help us consider capital raising
> alternatives in the very near term.  Second, we are
> seriously considering a 50% reduction in our common
> dividend.  These actions, coupled with other
> management steps, should provide sufficient capital
> flexibility for us to manage the Company for our
> shareholders and meet our charter through the balance
> of this credit downturn.  When things return to
> normal, we are committed to returning the excess
> capital to our shareholders.

(Am. Compl. ¶ 448) (emphasis in original).  Later, Freddie Mac
reiterated its hopeful outlook:   "Freddie Mac is not on the
threshold of conservatorship because we are adequately
capitalized." (Am. Compl. ¶ 7).  At no point in the Amended

Complaint do Plaintiffs allege that Freddie Mac failed to engage investment banks to consult on raising capital, nor do Plaintiffs allege that Freddie Mac and its executive were not "seriously considering" a reduction in the common-stock dividend.  Plaintiffs also characterize Syron's November 2007 statement that Freddie Mac had "identified a clear path to improve our financial results and [was] moving down that path very aggressively," (Am. Compl. ¶ 449), without giving any plausible explanation about why this statement was without a basis in fact when it was spoken.  Additionally, the only fact alleged to support Plaintiffs' assertion that Freddie Mac's July and August 2008 statements were made with willful disregard for the truth is that Freddie Mac was eventually placed into conservatorship two months later. (Am. Compl. ¶¶ 7, 13, 526). In a volatile economic, political, and regulatory environment like the one that existed in the summer and early fall of 2008, with even Freddie Mac's primary regulator being replaced, Plaintiffs must show more to plausibly claim that Freddie Mac's statements were made without any basis in fact.  Therefore, Plaintiff has not adequately pleaded sufficient facts giving rise to a strong inference that Freddie Mac's statements about its capital adequacy or its hope that it would continue to function were made with intent to defraud or without factual basis.

An issue closely related to Freddie Mac's capital adequacy
is whether Freddie Mac misapplied or ignored GAAP in reporting
its core capital.  An allegation that a party violated GAAP can
support a claim under the federal securities laws "[o]nly where
such allegations are coupled with evidence of corresponding
fraudulent intent." ECA, Local 134 IBEW Joint Pension Trust of
Chicago v. JP Morgan Chase Co., 553 F.3d 187, 200 (2d Cir. 2009)
(quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)).
Plaintiffs offer facts that would create only a weak inference
that Freddie Mac or the Individual Defendants intended to
defraud the public and not permissibly to express general
optimism about Freddie Mac's future.  Clearly, the Individual
Defendants were senior executives who, as demonstrated by the
allegations of the confidential witnesses, received warnings
from people both inside Freddie Mac and outside Freddie Mac
about the potential for catastrophic failure.  However, several
allegations raised in the Amended Complaint suggest that the
determination of Freddie Mac's core capital required executives
at Freddie Mac to make a subjective determination about future
events.  When combined with the fact that Freddie Mac disclosed
its allegedly fraudulent accounting decisions not to take
impairments on certain RMBS it held or its deferred tax assets
in its financial reports, it is clear that Freddie Mac gave the
public sufficient information to question Freddie Mac's

accounting decisions in light of differing assumption .  It would be a different scenario if Freddie Mac had reported its deferred tax assets as securities held for investment purposes or if it labeled its investments in RMBS as investments in U.S. Treasuries, and failed to give the public any data with which to analyze its accounting.

For the reasons stated above, Plaintiffs' claims that Freddie Mac falsely reported its capital adequacy and its core capital are not accompanied by facts giving rise to a "strong inference" of scienter as required by Section 101(b) of the PSLRA, 15 U.S.C. § 78u-4(b).

### 3.  Internal Controls

Finally, Plaintiffs seek to hold Freddie Mac liable for statements related to its internal controls and underwriting processes.  Freddie Mac argues that it made numerous disclosures relating to acknowledged weaknesses in it internal controls and that Plaintiffs have not pleaded facts giving rise to a "strong inference" of scienter with respect to any misstatements.

Without deciding the issue of whether Plaintiffs adequately pleaded facts supporting the existence of a material misrepresentation or a strong inference of scienter, the Court rejects Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims for alleged misstatements about Freddie Mac's underwriting and internal controls because Plaintiffs have not adequately pleaded

loss causation with respect to these alleged misrepresentations. Granting every reasonable favorable inference in favor of Plaintiffs, there are simply no facts in the Amended Complaint from which one could reasonably infer a causal link between Freddie Mac's statements about its underwriting standards and internal controls and any loss suffered by purchasers of its equity securities during the Class Period.

The Second Circuit has clearly held that "to plead loss causation the complaints must allege facts that support an inference that [a company's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 175 (2d Cir. 2005).  In this case, all representations made by Freddie Mac about its internal controls were accompanied by cautionary language identifying the potential risks posed by the massive enterprise in which Freddie Mac was engaged.

As discussed above, when faced with declining home prices, Freddie Mac determined to work with consultants to automate underwriting processes and thereby improve the accuracy of its internal controls.  Numerous statements made by confidential witnesses reveal deficiencies in Freddie Mac computer systems, but they also reveal that Freddie Mac actually engaged in

efforts to improve those systems.  For loans its internal
systems could not process, Freddie Mac used both a manual
"sampling" technique to ensure the quality of loans and relied
on analysis performed by mortgage originators and outside
consultants.  However, even accepting for the sake of argument
Plaintiffs' assertions about the attempts Freddie Mac was making
to improve its underwriting processes, Plaintiffs have failed to
plead that the disclosure of a defect in these processes
proximately caused Plaintiffs any economic loss.  None of the
"partial" disclosures alleged to have been made between July
through September 2008 is alleged to have revealed new
information about the failings of Freddie Mac's internal
controls or underwriting standards.

The only alleged disclosure of defects in Freddie Mac's
internal controls and underwriting processes as pleaded by
Plaintiffs is the allegation that on September 8, 2008, when the
U.S. Government placed Freddie Mac into conservatorship,
"Defendants' massive, ongoing fraud came to a screeching halt."
(Am. Compl. ¶ 563).  In their motion papers, Plaintiffs describe
this as the moment when "the realities of Freddie's financial
condition and future business prospects finally overcame
Defendants' wall of misinformation and false and misleading
statements--all the lies were exposed." (Dfs.' Mem. Opp 10).
Plaintiffs make no specific factual allegations about the

-33-

disclosure of concealed information relating to Freddie Mac's
internal controls and do not explain how they "would have been
spared all or an ascertainable portion of that loss absent"
Freddie Mac's alleged failure properly to disclose weaknesses in
its internal controls. Lentell, 396 F.3d at 175.

Considering that the price of Freddie Mac's stock was
clearly linked to the "marketwide phenomenon" of the housing
price collapse, there is a decreased probability that
Plaintiffs' losses were caused by fraud. Id. at 174.  Therefore,
even under the liberal pleading standards of Rule 8, plaintiffs
do not "state[ ] a plausible claim for relief," Iqbal, 129 S.
Ct. at 1950, and therefore these claims too must be dismissed.

To the extent that Plaintiffs claim that Freddie Mac and
the Individual Defendants violated Section 10(b) of the '34 Act
and SEC Rule 10b-5 by misrepresenting the strength of its
underwriting standards and financial reporting, these claims
fail because Plaintiffs have not plausibly alleged that these
misrepresentations proximately caused them economic harm.

**B.   Individual Defendants' Motion to Dismiss**

**1.   Section 10(b) of the '34 Act and SEC Rule 10b-5 Claims**

For the reasons stated above with respect to Freddie Mac's
motion to dismiss, the Individual Defendants' motion to dismiss
Plaintiffs Section 10(a) of the '34 Act and SEC Rule 10b-5
claims is granted.

**2.    Liability under Section 20(a) of the '34 Act**

A plaintiff seeking to hold a "control person" liable for another's violation of the securities laws must show:  "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the [controlling person] was in some meaningful sense a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  In this case, Plaintiffs allege that the Individual Defendants were "controlling persons" of Freddie Mac when it violated Section 10(b) of the '34 Act and SEC Rule 10b-5. (Am. Compl. ¶ 596). Because Plaintiffs have failed adequately to plead that Freddie Mac violated the federal securities laws, the Individual Defendants' motion to dismiss Plaintiffs' claims under Section 20(a) of the '34 Act and SEC Rule 10b-5 is granted.

**C.    Dismissal with Prejudice**

Under the Federal Rules of Civil Procedure, a district court must "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2).  While a "district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009), Defendants have not made an adequate showing that there is "good reason" to deny Plaintiffs leave to amend.  Therefore,

though the Court dismisses the Amended Complaint, it is dismissed without prejudice.

### III.  Conclusion

Because Plaintiffs have failed adequately to plead the existence of actionable misstatements or omissions of fact relating to Freddie Mac's exposure to non-prime mortgage loans or its capital adequacy, and because they have failed to plead loss causation with respect to their claims relating to Freddie Mac's internal controls and financial statements, Freddie Mac's and the Individual Defendants' motions to dismiss Plaintiffs' Section 10(b) of the '34 Act and SEC Rule 10b-5 claims are both GRANTED.

Additionally, because the validity of a Section 20(a) claim against a "controlling person" depends on the existence of a valid claim against the allegedly controlled person, and because Plaintiffs have failed to state a claim against Freddie Mac, the Individual Defendants' motion to dismiss Plaintiffs' claims under Section 20(a) of the '34 Act is GRANTED.

Plaintiffs are granted sixty (60) days from the date of this Opinion & Order to file a Second Amended Complaint. Defendants shall answer or otherwise respond to Plaintiffs' Amended Complaint, if filed, within forty-five (45) days of being served with the Second Amended Complaint.

    The Clerk of Court is directed to terminate the motions at

docket numbers 143 and 147.


**SO ORDERED.**

Dated:     New York, New York
           March 30, 2011

                                  _____
                                       JOHN F. KEENAN
                                  United States District Judge