UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sept. 24, 2012
```

------------------------------------X

JINO KURIAKOSE, Individually and  :
on Behalf of All Others Similarly  :
Situated,  :
  :
                Plaintiff,  :
  :       08 Civ. 7281 (JFK)
  -against-  :
  :    **OPINION AND ORDER**
FEDERAL HOME LOAN MORTGAGE CORP.,  :
RICHARD SYRON, PATRICIA L.  :
COOK, and ANTHONY S. PISZEL,  :
  :
             Defendants.  :

------------------------------------X

APPEARANCES

    For Lead Plaintiff Central States, Southeast and Southwest
    Areas Pension Fund:
        ROBBINS GELLER RUDMAN & DOWD LLP
        By:  Paul J. Geller, Esq.
            David J. George, Esq.
            Robert T. Robbins, Esq.
            Samuel H. Rudman, Esq.
            Darryl J. Alvarado, Esq.

    For Plaintiff National Elevator Industry Pension Plan:
        O'DONOGHUE & O'DONOGHUE LLP
        By:  Louis P. Malone III, Esq.

    For Defendants Federal Home Loan Mortgage Corporation:
        BINGHAM MCCUTCHEN LLP
        By:  Jordan D. Hershman, Esq.
            Jason D. Frank, Esq.
            Kenneth I. Schacter, Esq.

        FEDERAL HOME LOAN MORTGAGE CORPORATION
        By:  Hyacinth Kucik, Esq.
            Lance J. Wolf, Esq.
            Howard Lindenberg, Esq.

    For Defendant Anthony S. Piszel:
        MURPHY & MCGONIGLE, P.C.
        By:  James K. Goldfarb, Esq.
            Jonathan S. Bashi, Esq.
            Jerry Isenberg, Esq.
            William Donnelly, Esq.

**JOHN F. KEENAN, United States District Judge:**

Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund and Plaintiff National Elevator Industry Pension Plan (collectively, "Plaintiffs") bring this putative securities fraud class action suit against the Federal Home Loan Mortgage Corporation ("Freddie Mac"), former Freddie Mac Chief Executive Officer Richard Syron ("Syron"), former Freddie Mac Chief Financial Officer Anthony Piszel ("Piszel"), and former Chief Business Officer Patricia Cook ("Cook") (collectively, "Individual Defendants"). Plaintiffs allege that Freddie Mac and the Individual Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("'34 Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. Furthermore, Plaintiffs allege that the Individual Defendants are "controlling persons" liable under Section 20(a) of the '34 Act, 15 U.S.C. § 78t, for Freddie Mac's alleged violations of the '34 Act and Rule 10b-5.

Currently before the Court are three motions: (1) Freddie Mac and the Individual Defendants' motion to dismiss with prejudice the Second Amended Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and under Sections 101(b) and 102(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4(b), 78u-5(c); (2) Plaintiffs' motion for leave to file a third amended

2

consolidated complaint; and (3) Plaintiffs' renewed motion to partially lift the PSLRA discovery stay.  For the reasons that follow, Defendants' motion to dismiss is granted, Plaintiffs' motion to amend is denied, and Plaintiffs' renewed motion to lift the PSLRA discovery stay is denied as moot.

## I.  Background

The Court presumes familiarity with the allegations made in Plaintiffs' First Amended Class Action Complaint ("FAC") and the procedural history of this litigation prior to the entry of its last Opinion. See Kuriakose v. Federal Home Loan Mortg. Corp., 2011 WL 11580258, (S.D.N.Y. Mar. 30, 2011) (hereinafter "Op."). Briefly stated, Plaintiffs represent a putative class consisting of all those who purchased Freddie Mac equity securities from November 20, 2007, through September 7, 2008 ("the Class Period").  Plaintiffs claim that following Freddie Mac's disclosure of a $2 billion loss for the third quarter of 2007 on November 20, 2007, Freddie Mac and the Individual Defendants materially misrepresented Freddie Mac's exposure to risky, or "subprime," mortgage products, the sufficiency of its capital, and the accuracy of its financial reporting.  According to Plaintiffs, these misrepresentations resulted in inflated share prices of its common and preferred shares, which declined as "the truth regarding Freddie Mac's true financial circumstances leaked out through a series of partial disclosures, and

3

Defendants' prior misrepresentations and fraudulent conduct
became apparent to the market." Op. at 3.

### A.   Dismissal of the FAC

In dismissing the FAC, the Court held that Plaintiffs
failed to plead (1) materiality with respect to the extent of
Freddie Mac's exposure to non-prime, or subprime, mortgage
loans; (2) scienter with respect to the allegation that Freddie
Mac misstated its capital adequacy; and (3) loss causation with
respect to alleged misrepresentations about Freddie Mac's
internal controls and alleged violations of generally accepted
accounting principles ("GAAP").  Since each of these elements is
required to withstand a motion to dismiss, the Court dismissed
the FAC.

Regarding Freddie Mac's statements about its subprime
exposure, the Court found that Plaintiffs failed to establish
materiality with respect to their allegations that Defendants
misrepresented Freddie Mac's exposure to the subprime market.
The Court further held that Plaintiffs did not explain why any
of Freddie Mac's alleged misrepresentations were actually false,
in light of the amount of information that Freddie Mac disclosed
to investors during the Class Period.  Specifically, the Court
stated that the public was sufficiently made aware of the extent
of Freddie Mac's exposure to "non-conforming" mortgages, and
without an industry standard definition of the term "subprime,"

Freddie Mac's statements were not false or misleading. Op. at 26 ("Plaintiffs present no theory at all about why Freddie Mac's disclosures would not be understood by the reasonable investor and thus part of the 'total mix' of information that determined its share price."). The Court determined that Plaintiffs' allegations did not give rise to the inference that Freddie Mac and its executives made fraudulent accounting decisions in violation of GAAP. Op. at 30.

Next, in holding that Plaintiffs did not adequately plead scienter, the Court found that the alleged misstatements were "forward-looking" and thus not actionable. The Court further noted that the fact that Freddie Mac was placed in a conservatorship does not give rise to an inference of scienter, given the stress placed on Freddie Mac's financial position by the volatility of the financial market during the Class Period. Op. at 27-29 ("Plaintiffs have not adequately pleaded sufficient facts giving rise to a strong inference that Freddie Mac's statements about its capital adequacy or its hope that it would continue to function were made with intent to defraud or without factual basis.").

The Court's holding with respect to loss causation addressed Plaintiffs' allegations of Freddie Mac's violations of GAAP, as well as statements about the company's internal controls. The Court concluded that Plaintiffs alleged no causal

connection between Freddie Mac's alleged misconduct and any loss suffered by purchasers of its equity securities during the Class Period. Op. at 33 ("[N]one of the 'partial' disclosures alleged to have been made between July through September 2008 is alleged to have revealed new information about the failings of Freddie Mac's internal controls or underwriting standards.").

## B.    Second Amended Complaint

On July 18, 2011, Plaintiffs filed the Second Amended Class Action Complaint ("SAC"), which is 136 pages (153 pages shorter than the FAC) and 342 paragraphs (256 paragraphs shorter than the FAC).  The SAC asserts new factual allegations, largely based on an internal memorandum from the acting deputy director at Freddie Mac's regulator, the Federal Housing Finance Agency ("FHFA") to the Director of the FHFA (the "FHFA Memo").  In its memorandum opposing Defendants' motion to dismiss the SAC ("Pl. SAC Opp."[1]), Plaintiffs herald the FHFA Memo as the "centerpiece of the SAC," because it "provide[s] a damning assessment of the current state of Freddie's business during the Class Period and justified the Agency's need to place Freddie into a conservatorship." Pl. SAC Opp. at 14.  According to Plaintiffs,

[1] The Court will refer to the parties' various motion papers as follows:  Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss the SAC, "Pl. SAC Opp."; Plaintiffs' Memorandum in Support of its Motion to Amend, "Pl. Mot. to Amend"; Intervenor FHFA's Brief in Opposition to Plaintiffs' Motion to Lift the PSLRA Stay, "FHFA Opp. PSLRA Stay"; Defendants' Memorandum in Support of its Motion to Dismiss the SAC, "Def. SAC Mot."; Defendants' Appendix in Support of its Motion to Dismiss the SAC: "Def. App.".

"this document details 'pervasive and ongoing problems and deficiencies' caused by Defendants 'unsafe and unsound practices.'" Id. (quoting FHFA Memo at 2, 28).

### C.   Proposed Third Amended Complaint

Subsequent to filing the SAC, on December 13, 2011, Freddie Mac entered into a Non-Prosecution Agreement with the Securities and Exchange Commission ("SEC").  Plaintiffs now seek to file a Third Amended Class Action Complaint ("TAC"), which is 29 pages and 65 paragraphs longer than the SAC.  It includes a host of additional allegations based upon the Statement of Facts contained in the Non-Prosecution Agreement. TAC Exh. C (full text of the SEC Non-Prosecution Agreement).  Plaintiffs aver that, through the Agreement, "Freddie Mac agreed to a detailed accounting of the events that clearly establish the falsity of Freddie Mac's subprime exposure during the Class Period." Pl. Mot. to Amend at 3.

### II. Discussion

### A.   Legal Standard

To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their

injury." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir.), cert. denied, 546 U.S. 935 (2005).

As it did in reviewing Defendants' motion to dismiss the FAC, the Court treats all factual allegations in the SAC as true and draws all reasonable inferences in Plaintiffs' favor. See Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lee v. Bankers Trust Co., 166 F.3d 540 (2d Cir. 1999). "Dismissal is proper 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)). Because the SAC charges securities fraud, Plaintiffs must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4. See Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). Thus, "[t]he complaint must identify the statements plaintiff[s] assert[ ] were fraudulent and why, in plaintiff[s]' view they were fraudulent, specifying who made them, and where and when they were made." In re Scholastic Corp., 252 F.3d at 69-70.

Leave to amend a pleading should be freely granted when justice so requires. Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. 178, 182 (1962); Dluhos v. Floating & Abandoned Vessel, 162 F.3d 63, 69 (2d Cir. 1998). "Nonetheless, the Court may deny

leave if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) the opposing party would be prejudiced, or (4) would be futile." Lee v. Regal Cruises, Ltd., 916 F. Supp. 300, 303 (S.D.N.Y. 1996). A proposed amended complaint is futile when it fails to state a claim. Id. "The Proposed Amended Complaint may therefore be scrutinized as if defendant's objections to the amendments constituted a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." Journal Publ'g Co. v. Am. Home Assurance Co., 771 F. Supp. 632, 635 (S.D.N.Y. 1991). District courts have "broad" discretion in ruling on a motion to amend. Local 802, Associated Musicians v. Parker Meridien Hotel, 145 F.3d 85, 89 (2d Cir. 1998).

Accordingly, in evaluating the instant motion to dismiss and motion to amend, the Court will consider whether the SAC and the proposed TAC cure the deficiencies that the Court identified in the FAC. To that end, the Court will consider whether the SAC or the proposed TAC adequately plead (1) loss causation, (2) materiality, and (3) scienter. Should the proposed TAC fail to plead these elements, leave to amend will be denied as futile. See Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990) ("Although Fed. R. Civ. P. 15(a) provides that leave to amend should be given freely when justice so requires, where, as here, there is no merit in the proposed amendments, leave to amend should be denied.").

## B. Loss Causation

To demonstrate loss causation, plaintiffs "must prove both transaction and loss causation." Lentell, 396 F.3d at 172 (internal quotations and citations omitted).  "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Id. at 172. (internal quotation marks omitted).  The concept of loss causation is related to the doctrine of proximate cause. See Merrill Lynch & Co. v. Allegheny Energy, 500 F.3d 171, 183 (2d Cir. 2007).  A defendant's alleged "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell, 396 F.3d at 173.  To establish loss causation, the loss must be foreseeable and the loss must be caused by the "materialization of the concealed risk." Id.  "[A] plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id.  Thus, "the Second Circuit has made clear that in order '[t]o plead loss causation, the complaints must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that

10

bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.'" <u>In re Initial Pub. Offering Secs. Litig.</u>, No. 21 MC 92, 2008 U.S. Dist. LEXIS 24148, at *24 (S.D.N.Y. Mar. 26, 2008) (quoting <u>Lentell</u>, 396 F.3d at 175).

As discussed above, in dismissing the FAC, the Court found that "Plaintiffs have not plausibly alleged that these misrepresentations proximately caused them economic harm." Op. at 34. Specifically, the Court held, "Plaintiffs make no specific factual allegations about the disclosure of concealed information relating to Freddie Mac's internal controls and do not explain how they would have been spared all or an ascertainable portion of that loss absent Freddie Mac's alleged failure properly to disclose weaknesses in its internal controls." <u>Id.</u>

Although Plaintiffs espouse the same theory of loss causation as it did in the FAC, the SAC sets forth a litany of "partial disclosures" Freddie Mac made between July 2008 and September 2008 that allegedly "revealed . . . a series of increasingly disturbing events <u>directly related</u> to Plaintiffs' allegations" of misrepresented capital adequacy. Pl. SAC Opp. at 54 (emphasis in original); SAC ¶¶ 248, 253, 256, 258, 261-62, 271, 283, 286, 288, 291-95. Plaintiffs point to, among other things, an announcement of a Moody's downgrade, a series of

reports detailing the government's plan to "rescue" Freddie Mac (including the possibility of placing the company in a conservatorship), and news articles explaining the depletion of Freddie Mac's capital. Id.

Importantly, however, the articles and events that Plaintiffs cite as "partial disclosures" fail to disclose anything about the alleged scheme underlying this lawsuit. Rather, these "partial disclosures" indicate nothing more than that Freddie Mac was in a precarious financial position throughout the Class Period – hardly something that, alone, could establish liability. The news articles about credit losses and Freddie Mac's capital merely synthesized information that was already known to investors. Similarly, the Moody's downgrade does not signal anything about Freddie Mac's capital adequacy. See In re Manulife Fin. Corp. Sec. Litig., 276 F.R.D. 87, 104 (S.D.N.Y. 2011) (holding that a Fitch ratings downgrade is insufficient to establish loss causation where the downgrade did not reveal any information relating to the alleged fraud). News articles about the looming conservatorship for Freddie Mac also do not constitute a corrective disclosure, as they do nothing to reveal that Freddie Mac executives were embroiled in a fraudulent scheme to distort its financials.

As the Court already held, Freddie Mac made detailed disclosures regarding the company's portfolios throughout the

Class Period. Op. at 26.  Because all relevant information was already available to investors, these purported disclosures cannot possibly be "corrective."  In this regard, the Second Circuit's decision in Lentell is fatal to Plaintiffs' attempts to plead loss causation.  The Lentell Court found that despite the plaintiffs' allegations that defendants had issued false and misleading "buy" and "accumulate" recommendations, the research reports at issue were replete with warnings about the high-risk nature of the investment, and "the risk of price volatility — and hence, the risk of implosion — is apparent on the face of every report challenged in the underlying complaints." Lentell, 396 F.3d at 176.  The Second Circuit concluded:

> [W]here (as here) substantial indicia of the risk that
> materialized are unambiguously apparent on the face of the
> disclosures alleged to conceal the very same risk, a
> plaintiff must allege (i) facts sufficient to support an
> inference that it was defendant's fraud—rather than other
> salient factors—that proximately caused plaintiff's loss;
> or (ii) facts sufficient to apportion the losses between
> the disclosed and concealed portions of the risk that
> ultimately destroyed an investment.

Id. at 177.

As in Lentell, although some of Freddie Mac's statements were ultimately proven wrong, they "were accompanied by the underlying, accurate financial data, so that [investors] could review the financial information and evaluate the risk for themselves." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007) (citing Lentell, 396 F.3d at 177).  Like the

13

plaintiffs in <u>Lentell</u>, Plaintiffs here make only vague allegations that the truth "became known" and rely on the fact that the events detailed in the Complaint are "disturbing" enough to establish that they signaled to investors that Freddie Mac's capital was inadequate.  Plaintiffs have not set forth allegations that would lead to the conclusion that any of these statements were corrective, given that Freddie Mac made extensive disclosures with respect to its investments.

Turning to the FHFA Memo in the SAC and the SEC Non-Prosecution Agreement in the proposed TAC, the Court notes that both were released years after the end of the Class Period and thus do not help establish loss causation.  Because the FHFA Memo was only recently released, it is impossible to classify any of its conclusions as "corrective disclosures" to investors during the Class Period.  This logic applies with equal force to the SEC Non-Prosecution Agreement, which was released after the FHFA Memo.  As a result, the new factual allegations in the SAC and proposed TAC cannot cure the defects the Court identified in the FAC with respect to loss causation.

## C.   Materiality

A misstatement or omission is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231 (1988) (quoting <u>TSC Indus., Inc. v.</u>

14

Northway, Inc., 426 U.S. 438, 449 (1976)).  "Material facts include those that affect the probable future of the company and that may affect the desire of investors to buy, sell, or hold the company's securities." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001).  To fulfill the materiality requirement, Plaintiffs must allege facts that demonstrate a substantial likelihood that the statement or omission "significantly altered the total mix of information made available," as viewed by the reasonable investor. Basic, 485 U.S. at 231–32.

### i.   PSLRA Safe Harbors

The Court will first consider whether Defendants' general and optimistic statements do not fall under the safe harbor provisions of the PSLRA.  Plaintiffs have highlighted the following statements that they argue do not warrant safe harbor:

> "(1) 'Freddie Mac is adequately capitalized, highly liquid'; (2) 'the combination of our existing capital base, our capital raise, and the regulatory relief, puts us in a very strong capital position'; (3) 'we are deliberately putting ourselves in a very, very strong capital position'; (4) 'we have a very solid capital base'; (5) 'our capital is intact'; (6) 'we think we've acted prudently and decisively to protect and bolster our capital'; (7) "we will have a substantial capital cushion'; (8) 'Freddie Mac is not on the threshold of conservatorship because we are adequately capitalized'; and (9) 'we exceed our regulatory capital standards and remain highly liquid.'"

Pl. SAC Opp. at 20 (quoting SAC ¶¶ 214, 233, 235, 241, 245, 250, 263).

Forward-looking statements are not actionable if they fall within the "safe harbor" provisions of the PSLRA, detailed in 15 U.S.C. § 78u-5(c). In re QLT Inc. Sec. Litig., 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004).  Three categories of statutory safe harbors exist under the PSLRA.  The first protects forward-looking statements when they are identified as forward-looking and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  This safe harbor is complemented by the judicially-created "bespeaks caution" doctrine, under which "'alleged misrepresentations are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language.'" In re QLT, 312 F. Supp. 2d at 532 (citations omitted).

To determine whether cautionary language is adequate, courts first identify the allegedly undisclosed risk. Here, Plaintiffs allege that Freddie Mac failed to disclose its lack of capital and exposure in the subprime market. Pl SAC Opp. at 20.

Second, courts read the allegedly misleading materials and the cautionary language together to determine whether "a reasonable investor could have been misled into thinking that

16

the risk that materialized and resulted in his loss did not actually exist." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002).  The cautionary information need not be in the same document that contains the forward-looking statement, but must instead be reasonably available to investors and affect the "'total mix'" of information. Id. at 357 (quoting Basic, 435 U.S. at 231-232).  As an initial matter, the Court notes that it has previously found that "all representations made by Freddie Mac about its internal controls were accompanied by cautionary language identifying the potential risks posed by the massive enterprise in which Freddie Mac was engaged." Op. at 35.

Freddie Mac's 2007 Annual Report included broad disclosures with respect to (1) its underwriting processes, (2) its internal controls, (3) credit risks associated with "nontraditional" mortgages and (4) the characteristics of the mortgages in its portfolio. Def. App. 6 at 56.  In particular, Freddie Mac warned investors that a "continued decline in U.S. housing prices or other changes in the U.S. housing market could negatively impact our business and earnings." Id. at 15.  The Report went on to caution that the declining trend in home price appreciation "could result in an increase in delinquencies or defaults and a level of credit-related losses." Id.

The extent to which Freddie Mac disclosed relevant information as to potential risks in its widely distributed Annual Report counsels that statements made concurrent with or after 2007 "bespoke caution." See Kemp v. Univ. Am. Fin. Corp., 05 Civ. 9883, 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) (applying the "bespeaks caution" doctrine where defendants included appropriate warnings in its annual reports).

A second statutory safe harbor protects forward-looking statements when they are immaterial. 15 U.S.C. § 78u-5(c)(1)(A)(ii).  Mere puffery or generalized expressions of optimism are immaterial as a matter of law. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.") (internal quotations omitted).

Plaintiffs unsuccessfully attempt to escape application of this safe harbor provision by urging the Court to deem all puffery statements actionable by virtue of the fact that Freddie Mac's mission was to facilitate liquidity in the home mortgage market.  This public mission, Plaintiffs argue, sets Freddie Mac apart as an entity that should have been uniquely equipped to deal with a housing crisis. It noted that in Lapin v. Goldman

18

Sachs Grp., 506 F. Supp. 2d 221 (S.D.N.Y. 2006), Judge Karas
found that statements by Goldman Sachs, which would otherwise be
classified as puffery, were actionable because Goldman Sachs
used the statements to "distinguish itself from other
institutions." Lapin at 240 ("[T]he Second Amended Complaint
does more than identify rosy predictions or vague statements
about Goldman's integrity; Goldman stated that such integrity
'was at the heart'" of its business."). Lapin, however, is
inapposite.  Plaintiffs have not alleged that Freddie Mac made
statements about factors that were "at the heart of" its
business.  Nor did Freddie Mac executives set out to tout the
company as invincible to the vagaries of the housing market, or
the economy on the whole.  To the contrary, Plaintiffs point to
vague and indefinite statements of general optimism.  See, e.g.,
SAC ¶¶ 104, 188, 206-07, 213, 220-50, 263, 273, 274.  Such
statements fall squarely within the PSLRA's safe harbor for
puffery. Rombach, 355 F.3d at 174.

The third safe harbor provision of the PSLRA protects
forward-looking statements unless the plaintiff can prove that
the statement "was made with actual knowledge by that person
that the statement was false or misleading." 15 U.S.C. § 78u-
5(c)(1)(B).  As discussed below, because Plaintiffs fail to
plead any specific facts to support an inference of scienter,

19

they cannot avoid this safe harbor.  See In re QLT, 312 F. Supp. 2d at 534.

### ii.  Alleged GAAP Violations

Although allegations of GAAP violations alone are insufficient to state a claim, see Gavish v. Revlon, Inc., No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004), Plaintiffs seek to bolster their materiality argument by asserting that Freddie Mac violated Federal Accounting Standards (FAS) 115 and 109.  FAS 115 and 109 both require that financial writedowns be made if – in the judgment of the company's accountants – certain events are likely to occur.  Courts are reluctant to substitute their judgment for that of expert accountants. Oleck v. Fischer, 623 F.2d 791, 795 (2d Cir. 1980), In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010), SEC v. Price Waterhouse, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992).  Here, Plaintiffs have not alleged any facts that would cause the Court to question the judgment of the company's accountants.

FAS 115 governs accounting for "other than temporary impairments" and provides that companies are required to write down the fair value of a security if it is probable that an investor will be unable to collect all amounts due according to the contractual terms of a debt security. SAC ¶ 107. Necessarily, application of this principle requires a subjective

determination of when it is "probable" the other party will default on its loan.  Yet Plaintiffs have not alleged any facts showing that the company believed it was probable that all payments would not be collected.  Since there are no allegations that Freddie Mac recognized but ignored the probability that a party would default on its loan, Plaintiffs have not pleaded a violation of FAS 115. See In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) ("GAAP, however, does not require that management write down assets as [other than temporary impairment], if management considers it probable that all amounts due will be collected and that the security will recover its value during the period management intends to hold it.").

FAS 109 governs the maintenance of deferred taxes on a company's balance sheet.  It provides that when it is "more likely than not" that a company will not be able to receive tax benefits due to an uncertainty about the company's future taxable income, a company should write off its deferred tax assets against earnings. SAC ¶¶ 152-62.  This "more likely than not" standard is also nebulous, but – again – Plaintiffs have alleged no specific facts from which the Court can conclude that Freddie Mac anticipated that it would not have any taxable income.

Instead, Plaintiffs rely on "fraud-by-hindsight" in arguing that because Freddie Mac's year-end balance sheet reflected a lack of capital, Defendants "should have known" that it was more likely than not that the company would not generate enough profits to use all of its tax offsets.  Allegations of "fraud by hindsight" are insufficient to withstand a motion to dismiss. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[W]e have refused to allow plaintiffs to proceed with allegations of fraud by hindsight. Corporate officials need not be clairvoyant." (internal citation and quotation marks omitted)); In re Citigroup Inc. Secs. Litig., 753 F. Supp. 2d 206, 246 (S.D.N.Y. 2010) (claim failed where plaintiffs relied on subsequent writedowns to argue that prior disclosures were misleading).

The additional allegations in the SAC based upon the FHFA Memo also do not support the inference that Freddie Mac committed GAAP violations.  Plaintiffs point to the finding in the FHFA Memo that Freddie Mac's "future earnings potential is non-existent" to demonstrate that the FHFA determined that Freddie Mac failed to adhere to FAS 109 by not offsetting its deferred tax earnings. Pl. SAC Opp. at 16.  To assert that the FHFA uncovered violations of FAS 115, Plaintiffs highlight a finding in the FHFA Memo that "[t]here has been a serious

reluctance on the part of the Enterprise to take writedowns despite clear signals from the market." Id.

These statements, even when viewed in a light most favorable to Plaintiffs, do not constitute a judgment by the FHFA that Freddie Mac violated GAAP.  As accountants and courts have long recognized, GAAP provisions are subject to interpretation. Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544 (1979).  "Generally accepted accounting principles . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management," id., and allow reasonable accountants to reach different conclusions.  As explained above, Plaintiffs have not alleged facts to support an inference that Freddie Mac was unreasonable in its judgments.  As a result, the Court will not intervene in a business and accounting judgment simply because the FHFA accountants reached different conclusions than Freddie Mac accountants.

Further negating any inference that Freddie Mac materially misstated its financials is the fact that the company never issued a restatement for its Class Period financials.  Freddie Mac's financial results have been scrutinized by several entities, including the FHFA, Congress, and an outside auditor, yet the company was never asked to issue a restatement.  While not dispositive, the lack of a restatement is noteworthy,

particularly since so many parties had an opportunity to review Freddie Mac's financials.

### iii. FHFA Memo

Plaintiffs rely heavily on the FHFA's findings that there were "pervasive and ongoing problems and deficiencies" at Freddie Mac, and that the "management and the Board of Directors have not demonstrated the ability to implement effective corrective actions." But Plaintiffs do not explain how these allegations implicate Freddie Mac or its officers in securities violations. Indeed, the FHFA itself has told the Court that the "memorandum does not purport to analyze whether Freddie Mac or its officers or directors had engaged in conduct that violates the federal securities laws, and none of the facts set forth in the FHFA memorandum corroborate Plaintiffs' allegations." FHFA Opp. PSLRA Stay at 2.

While it is instructive that the FHFA did not conclude that any of Freddie Mac's public statements contradicted its internal numbers, the Court's analysis of the FHFA Memo also confirms the FHFA's position. None of the statements in the FHFA Memo give rise to the inference that any of the Defendants' public statements were materially incorrect when made. Although the FHFA Memo raises troubling issues regarding the management of Freddie Mac, it does nothing to change the character of Defendants' alleged misstatements. Mismanagement does not

24

convert puffery into promises, nor does it provide the retroactive authoritative understanding of the term "subprime" that the Plaintiffs would need to rescue the materiality allegations in their Complaint.

### iv.  TAC Allegations

The Plaintiffs' proposed TAC attempts to establish materiality through the "Statement of Facts" portion of the SEC Non-Prosecution Agreement.  As discussed above, however, Plaintiffs' assertions of materiality are defeated by the fact that (1) Freddie Mac fully disclosed its participation in non-conforming loans, and (2) there was no agreed-upon definition of the term "subprime" at the time of these disclosures (a fact that was also disclosed by Freddie Mac). SEC Non-Prosecution Agreement at 7 ¶ 26 (stating that in its 2007 Annual Report, Freddie Mac reported that "[t]here is no universally accepted definition of subprime").  Having reviewed the SEC Non-Prosecution Agreement in its entirety, the Court can discern no facts that would establish materiality.

First, as the Court found in its previous opinion, Freddie Mac made extensive disclosures about its investments throughout the Class Period. Op. at 26.  Plaintiffs' claims are made even more tenuous by the fact that in annual and quarterly statements, Freddie Mac routinely detailed the credit characteristics of the loans in its guarantee portfolio,

divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios. <u>See, e.g.</u>, Def. App. at 6.

Plaintiffs allege in the TAC that Freddie Mac misled investors as to the number of "Caution Loans (C1, C2) and EA [Expanded Approval] loans" in its guarantee portfolio. <u>See e.g.</u>, TAC ¶ 110-11, 237, 265, 288.  According to Plaintiffs, these loans should have been labeled as "subprime;" and failure to classify them as such constituted a material misstatement.

Plaintiffs' arguments fail because Freddie Mac's broad disclosure all of its loan characteristics was an accurate way to relay information to investors, given the confusion surrounding the term "subprime."  Freddie Mac's method of disclosing information made it possible for a reasonable investor to, with little effort, take his own measure of risk in Freddie Mac's loan portfolio. <u>See, e.g.</u>, <u>Joffee v. Lehman Bros. Inc.</u>, No. 06-0903, 2006 WL 3780547, at *1 (2d Cir. Dec. 19, 2006) (affirming dismissal where "all of the facts which plaintiffs allege were concealed were, in fact, revealed in various public filings."), <u>Olkey v. Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal where defendant's disclosures "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed").

A specific example from the 2007 Annual Report is
instructive.  As Defendants point out, Freddie Mac disclosed
that 6% of its purchases during 2007 were of loans to borrowers
with credit scores less than 620, and 11% were of loans to
borrowers with credit scores between 620 and 659.  These
disclosures formed part of the "total mix" of information
available.  Through simple arithmetic (11 + 6), investors could
ascertain that 17% of Freddie Mac's purchases involved credit
scores less than 660.  A review of Freddie Mac's disclosures
over the Class Period reveals that the company relayed ample
information to investors about not only the details of its
guarantee portfolio, but also the risk factors associated with
its exposure to non-traditional markets. Id.  As such, investors
could assess for themselves the degree of risk presented by
Freddie Mac's holdings. See United Paperworkers Int'l Union v.
Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) (noting that
the "total mix" of information appropriately encompasses
"information already in the public domain and facts known or
reasonably available to the shareholders").

Plaintiffs attempt to convince the Court that Freddie Mac
was intentionally "muddying the waters" with changing internal
definitions of "subprime."  Absent a universally accepted
definition of the term, however, the Court cannot infer such
fraudulent intent; to do otherwise would be to impose liability

27

for failing to maintain uniform definitions of industry terms across departments, at all times.  Indeed, the fact that Freddie Mac employees attributed different definitions to the term "subprime" in internal correspondence has no bearing on whether Freddie Mac's public disclosures were misleading; rather it only highlights that the term had no set definition.

Plaintiffs also point to a series of statements made by Individual Defendants throughout the Class Period, alleging that they misrepresented Freddie Mac's subprime exposure.  For instance, Plaintiffs allege that Defendant Syron made misrepresentations at a Goldman Sachs conference in December 2007, when he stated that Freddie Mac "didn't do any subprime business." TAC ¶ 16.  The entire statement, detailed in Paragraph 44 of the SEC Non-Prosecution Agreement, reads:

> In terms of our insight in the subprime stuff, we didn't buy any subprime loans.  I mean, we bought some securities, which we can go through, and we think we're fine in.  We bought them for goal purposes.  But we didn't buy [and] guarantee, essentially any subprime loans. So we weren't in that business.

When viewed in context, it is apparent that Syron was making the assertion that while Freddie Mac was not "in the business" of purchasing or guaranteeing loans originated by traditional subprime channels, it was involved in securities in which the issuer characterized the underlying mortgages as subprime.

### D.   Scienter

To establish scienter, plaintiffs must allege "an intent to deceive, manipulate or defraud." Kalnit, 264 F.3d at 138.  In evaluating whether Plaintiffs have satisfied this requirement, "the Court must read the complaint in toto and most favorably to plaintiff." In re Regeneron Pharm., Inc. Sec. Litig., No. 03 Civ. 3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005). However, Plaintiffs must allege facts that give rise "to a strong inference that [defendants] acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2); "a weak yet reasonable inference of scienter" will not suffice. In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 618 (S.D.N.Y. 2005). Plaintiffs may establish scienter in either of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 51 (2d Cir. 1995).

Considering the motive and opportunity prong first, the Court finds that Plaintiffs have failed to identify a motive for the Individual Defendants to commit fraud.  Because none of the Individual Defendants sold stock during the Class Period, Plaintiffs instead assert that Defendants were "uniquely motivated" to commit fraud because they wanted Freddie Mac to

29

remain solvent and preserve their reputations. Pl. SAC Opp. at
35-36.  Far from "unique," these motivations are ubiquitous in
business.  As a result, they are "too generalized to allege the
proper 'concrete and personal' benefit required by the Second
Circuit [to support an inference of scienter]." In re PXRE Grp.,
Ltd. Sec. Litig., 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009);
see also Kalnit, 264 F.3d at 139 ("Motives that are generally
possessed by most corporate directors and officers do not
suffice to plead securities fraud.").

Having found that Plaintiff has failed to plead scienter
under the "motive and opportunity" prong, the Court next turns
to whether Plaintiffs have pleaded scienter by showing
"conscious misbehavior or recklessness."  The Second Circuit has
defined reckless conduct as "at the least, conduct which is
highly unreasonable and which represents an extreme departure
from the standards of ordinary care . . . to the extent that the
danger was either known to the defendant or so obvious that the
defendant must have been aware of it." Novak, 216 F.3d at 308
(internal quotation marks and citations omitted) (alteration in
original).  "An allegation that a defendant merely ought to have
known is not sufficient to allege recklessness." Hart v.
Internet Wire, Inc., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001)
(quotations omitted); see also In re Bayou Hedge Fund Litig.,
534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (noting that "the

strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud"). Further, if a plaintiff fails to allege adequate motive, as in this case, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be "correspondingly greater." See Kalnit, 264 F.3d at 142.

Despite these stricter requirements, Plaintiffs proffer only weak allegations of recklessness. They point to the FHFA Memo to allege that Defendants "must have known" that they were making misrepresentations about its subprime exposure and capital adequacy. However, as discussed above, the FHFA has explicitly rejected Plaintiffs' attempt to recharacterize the FHFA memo into a condemnation of Freddie Mac's executives and their practices. None of the findings in the FHFA Memo suggest that the Defendants were reckless in not knowing that their statements about capital adequacy were incorrect; rather, the FHFA Memo merely addresses the issue of whether Freddie Mac should be placed into a conservatorship. Moreover, the SAC does not allege any situations where any of the Defendants were put on notice that their statements about subprime mortgages were suspect. As Plaintiffs have failed to allege that Defendants had access to information that specifically informed them of the alleged misrepresentations about Freddie Mac's exposure, an inference of recklessness does not follow.

The Court also finds that a reasonable person would not deem Plaintiffs' purported inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 323.  Again, the ambiguity of the term "subprime" militates against the inference that Defendants' statements about Freddie Mac's subprime exposure were recklessly made.  Throughout the Class Period, Freddie Mac made investors aware of its exposure to "non-traditional" mortgages.  Whether executives referred to these loans as "risky," "non-prime," "subprime-like," or "subprime" is irrelevant since Freddie Mac fully disclosed the composition of the company's portfolio.  Under these circumstances, Plaintiffs' allegations do not support an inference of scienter. <u>See</u> <u>In re Salomon Analyst Level 3 Litig.</u>, 373 F. Supp. 2d 248 (S.D.N.Y. 2005) (where different employees within a company have different valuation models, a court cannot infer that one employee's valuation model constitutes the company's institutional opinion; thus, the fact that an employee used his own valuation model does not give rise to an inference of scienter).

Finally, the bevy of truthful disclosures that Freddie Mac made throughout the Class Period, covering everything from detailed credit characteristics to extensive risk assessments, also negates an inference of scienter.  It defies logic to conclude that executives who are seeking to perpetrate

32

fraudulent information upon the market would make such fulsome
disclosures.  If Freddie Mac executives sought to shield its
investors from "learning the truth of" its business, they needed
to be measurably more opaque. In re GeoPharma, Inc. Sec. Litig.,
399 F. Supp. 2d 432, 443 (S.D.N.Y. 2005) ("When evaluating
motive and opportunity allegations, the Second Circuit
authorizes inquiry, even at the motion to dismiss stage, as to
whether plaintiffs allege a scheme that has any chance of
achieving its putative ends.").

### E. Section 20(a) Claims

Because the SAC and proposed TAC fail to state a Section
10(b) claim against Freddie Mac, Plaintiffs' claims under
Section 20(a) against the Individual Defendants must also be
dismissed.

### F. Motion to Lift the PSLRA Discovery Stay

In light of the Court's dismissal of the SAC, and the
finding that filing the proposed TAC would be futile, the case
will be dismissed with prejudice.  Thus, Plaintiffs' pending
motion to lift the PSLRA Discovery Stay is moot.

### III. Conclusion

For the reasons stated above, Plaintiffs' motion for leave
to file the TAC is denied, Defendants' motion to dismiss the SAC
is granted with prejudice, and Plaintiffs' motion to lift the
PSLRA discovery stay is denied as moot.  The Clerk of Court is

33

directed to terminate the motions at docket numbers 193, 214,

218, and 234, and to close the case.

**SO ORDERED.**

Dated:     New York, New York
           September 24, 2012

_John F. Keenan_
                              JOHN F. KEENAN
                     United States District Judge

34